STATE OF MINNESOTA

IN SUPREME COURT

A12-2179

Court of Appeals

In re the Guardianship of:
  Jeffers J. Tschumy, Ward.

Gildea, C.J.
Dissenting, Anderson, J.
Dissenting, Stras and Page, JJ.
Took no part, Dietzen, J.

Filed: September 17, 2014
Office of Appellate Courts

_____

Michael J. Biglow, Law Offices of Michael J. Biglow, Minneapolis, Minnesota, for appellant Jeffers J. Tschumy, ward.

Robert A. McLeod, Karla M. Vehrs, Lindsey E. Middlecamp, Lindquist & Vennum LLP, Minneapolis, Minnesota; and

Charles W. Singer, Minneapolis, Minnesota, for respondent Joseph Vogel.

Lori Swanson, Attorney General, Nathan Brennaman, Deputy Attorney General, Saint Paul, Minnesota, for amicus curiae State of Minnesota.

Diane B. Bratvold, Jennifer A. Lammers, Amie E. Penny Sayler, Briggs and Morgan, P.A., Minneapolis, Minnesota and

Benjamin Peltier, Saint Paul, Minnesota; and

Teresa Knoedler, Minneapolis, Minnesota for amici curiae Minnesota Hospital Association and Minnesota Medical Association.

_____

S Y L L A B U S

1.     Even though this appeal may be technically moot, the court has jurisdiction

to resolve the appeal because the matter raised is functionally justiciable and presents an

1

important public issue of statewide significance that the court should resolve immediately.

2. The power of a guardian to consent to necessary medical treatment for a ward under Minn. Stat. § 524.5-313(c)(4)(i) (2012), includes the power to consent to the removal of a ward from life support systems when all interested parties agree that removal is in the ward's best interests.

Affirmed.

## O P I N I O N

GILDEA, Chief Justice.

The question presented in this case is whether court approval is required before a guardian who has the power to consent to necessary medical treatment for a ward under Minn. Stat. § 524.5-313(c)(4)(i) (2012), may consent to remove the ward from life-sustaining treatment when all the interested parties agree that such removal is in the ward's best interests. The district court held that a guardian who possesses the medical-consent power under Minn. Stat. § 524.5-313(c)(4)(i), cannot consent to the removal of a ward's life support without prior court approval. The court of appeals reversed, holding that unless otherwise limited by court order, a guardian given the statutory medical-consent power has the authority to consent to the removal of life-sustaining treatment without a separate order from the district court. Because we conclude that the guardian did not need further court approval, we affirm.

On September 24, 2007, a social worker at appellant Jeffers Tschumy's nursing facility filed a petition asking the Hennepin County District Court to appoint a guardian

for Tschumy. The social worker said 53-year-old Tschumy was "an incapacitated person" who "lack[ed] sufficient understanding or capacity to make or communicate responsible decisions concerning his person." According to the social worker, Tschumy was "facing multiple medical issues" and was "unable to make informed medical decisions."

After a hearing, the district court appointed Tschumy's then conservator to be his guardian. The court found "clear and convincing evidence" that Tschumy was "an incapacitated person" who needed a guardian. *See* Minn. Stat. § 524.5-310(a)(1) (2012) ("The court may appoint a . . . guardian . . . only if it finds by clear and convincing evidence that . . . the respondent is an incapacitated person."). The court made several findings of fact regarding Tschumy's needs at the time, many of which referred to his inability to make medical decisions for himself. The court said Tschumy needed assistance providing for his "health care, housing, food, transportation, and finances," and acknowledged that Tschumy did not appropriately manage his diabetes. The court also found that Tschumy was "incapable" of exercising certain "rights and powers," including the ability to consent to necessary medical care. In the letters of guardianship, the court gave the guardian the authority to, among other things, "[g]ive any necessary consent to enable, or to withhold consent for, the Ward to receive necessary medical or other professional care, counsel, treatment or service."

On October 6, 2009, the court replaced the first guardian with respondent Joseph Vogel. The court gave Vogel the same powers as the prior guardian and also named Vogel to be Tschumy's conservator. The successor letters of general guardianship said

Vogel had the power and authority to "[g]ive any necessary consent to enable, or to withhold consent for, the Ward to receive necessary medical or other professional care, counsel, treatment or service."

On April 15, 2012, Tschumy choked on a sandwich and went into respiratory and cardiac arrest. Tschumy lost his pulse, and the group home staff administered CPR. Doctors at Abbott Northwestern Hospital were able to remove fragments of the sandwich, but a CT scan showed Tschumy had an "anoxic brain injury."[1] In a report later filed with the district court, Tschumy's attorney laid out a dire prognosis for Tschumy. He said that since Tschumy had been in the hospital, "his conditions of severe and irreversible anoxic encephalopathy,[2] continuous seizures, and respiratory failure have not improved." Initial opinions of the doctors regarding Tschumy's "dismal prognosis for return of meaningful neurologic recovery" were confirmed as time passed, "as his seizures [could not] be controlled without deep sedation" and seizure medication. Tschumy's treatment team was in "unanimous agreement that this unfortunate man [had] suffered irreversible brain damage and [could not] survive."

On April 23, 2012, Allina Health System, d/b/a Abbott Northwestern Hospital, filed a motion asking the Hennepin County District Court to amend the successor letters of general guardianship to "specifically authorize the guardian to request removal of life

---

[1]     "Anoxic brain injury" is an injury to the brain due to a lack of oxygen. *See The American Heritage Dictionary* 76 (3d. ed. 1992) (defining "anoxia" as the "[a]bsence of oxygen").

[2]     "Encephalopathy" means "[a]ny of various diseases of the brain." *The American Heritage Dictionary* 606 (3d. ed. 1992).

4

support systems." The district court held a hearing the next day. Vogel opposed the motion to amend the successor letters, arguing that he already had the authority to approve the removal of life support. The court appointed attorney Michael Biglow to represent Tschumy, investigate what Tschumy would want, and make a recommendation to the court.

At a separate hearing the next week, Vogel testified that he had been a professional guardian and conservator for 24 years. Vogel said that prior to the April 2012 incident, he had tried to talk to Tschumy about what he would want to do in end-of-life situations, but that Tschumy "did not wish to talk about advanced directives." Vogel was not surprised by Tschumy's unwillingness because of Tschumy's "severe and chronic mental illness, and his attitudes towards the medical profession." Nonetheless, Vogel testified that he believed he had the authority to direct the hospital to remove Tschumy's life support. He said the court authorized him to "provide medical decision making for Mr. Tschumy when [he] was unable to do so and that medical decision making would be not only the provision of different medical services but the ending of those services . . . [if] appropriate." Vogel said he visited Tschumy, talked to doctors and nurses, and relied on his own observations of Tschumy over the course of the guardianship to decide that the hospital should remove Tschumy's life support.

Tschumy's attorney, Michael Biglow, also testified. Based on his investigation, Biglow said he believed Tschumy "would not want to be inside, confined to a hospital bed, having medical decisions made for him, by medical personnel and therefore, he would most likely opt not to have these life support services in place." Tschumy, he said,

"would prefer to be . . . allowed to die naturally." Biglow also noted in his report that the hospital's ethics committee recommended that life support be removed because the "burdens and risks" of continued treatment "heavily outweigh any possible benefits."

In an order filed May 11, 2012 ("May order"), the district court authorized the guardian and the hospital to remove Tschumy's life support systems. The court held that the medical power granted to a guardian does not grant the guardian the unrestricted authority to direct the removal of life support but said it would explain that holding in a later order, so as not to postpone Tschumy's removal from life support. Tschumy was removed from life support, and he died soon thereafter. On May 17, 2012, the court discharged Vogel as Tschumy's guardian.

On October 18, 2012, the district court filed a second order ("October order"), explaining why it concluded guardians do not have the power under Minn. Stat. § 524.5-313(c)(4)(i), to direct the removal of life support without prior court approval. The court explained that the medical power granted to guardians under the statute does not give guardians the unrestricted authority to direct the removal of life support. According to the court, the power to direct removal of life support "is not inherent in any of the enumerated powers normally granted a guardian," and therefore guardians seeking that power needed specific authorization from the district court.

Vogel appealed the district court's October order.[3] The court of appeals asked the parties to file "informal memoranda" addressing three questions: whether the district court's October order was independently appealable, whether Vogel had standing to appeal, and whether the appeal was moot. *In re Guardianship of Tschumy*, No. A12-2179, Order at 3-4 (Minn. App. filed Dec. 19, 2012). After the parties filed their informal memoranda, the court of appeals ruled that the case was properly before it. *In re Guardianship of Tschumy*, No. A12-2179, Order at 4 (Minn. App. filed Feb. 20, 2013). Specifically, the court found that the appeal was timely, Vogel had standing to appeal, and the case was not moot because it was "capable of repetition, yet evad[ed] review" and involved an important public issue of statewide significance. *Id.* at 2-4.

With respect to the merits of the case, the court of appeals reversed the district court. *In re Guardianship of Tschumy*, 834 N.W.2d 764, 775 (Minn. App. 2013). The court of appeals held that absent a limitation in the guardianship order, "the medical-

---

[3] On October 24, 2012, the district court ordered that Vogel remain on the case as the conservator of Tschumy's estate pending resolution of the appeal. Justice Stras's dissent therefore is mistaken in arguing that Vogel pursued the appeal to assert a purely personal interest. The dissent is also wrong in suggesting that the fact that Tschumy's estate is paying for both Tschumy's lawyer and Vogel is of any relevance in this case. The Legislature provided that Tschumy has the right to counsel and the district court was authorized to appoint counsel to represent Tschumy. *See* Minn. Stat. § 524.5-120(13) (2012). The Legislature also provided that the estate compensate both the guardian/conservator and counsel to the ward. *See* Minn. Stat. § 524.5-502 (2012).

During oral argument, an issue arose about the scope of the legal authority of the attorney the district court appointed to represent Tschumy. But the guardian-conservator did not question that authority, and no party briefed the issue. The record on the scope of the authority granted by the district court is, at best, ambiguous. Although we decide that the case is functionally justiciable, we express no opinion on the attorney's authority or on the details of the process by which the case reached us.

consent power granted to a guardian" under Minn. Stat. § 524.5-313(c)(4) includes the power to authorize disconnection of a permanently unconscious ward's life-support systems "without further authorization from the district court*." Id.* at 775. We granted the petition for review that Biglow, Tschumy's court-appointed attorney, filed.

I.

We turn first to the question of whether we have jurisdiction to decide this case. The parties do not contend that we lack jurisdiction. But the existence of a justiciable controversy is essential to our exercise of jurisdiction, so we can raise the issue on our own. *In re Schmidt*, 443 N.W.2d 824, 826 (Minn. 1989). And the question of our jurisdiction is a legal one that we review de novo. *In re McCaskill*, 603 N.W.2d 326, 327 (Minn. 1999).

A.

There are several interrelated, potential jurisdictional problems in this case. Tschumy has died, and no ruling we make will affect him. Vogel has been discharged as Tschumy's guardian, and similarly, no ruling we make will affect the scope of his guardianship over Tschumy. As a result, there are questions about the parties' continuing interest in this case, as well as questions about Vogel's standing to appeal the district court's October order and Tschumy's standing to appeal the court of appeals decision. *See Twin Cities Metro. Pub. Transit Area v. Holter*, 311 Minn. 423, 425 n.3, 249 N.W.2d 458, 460 n.3 (1977) ("That a party must be aggrieved in order to appeal remains fundamental to . . . Rule 103.03, Minnesota Rules of Civil Appellate Procedure."). When the case began, both parties before us had a clear interest in the case. But the parties may

8

have subsequently lost that interest. In this context, the jurisdictional question presented is fundamentally one of mootness. As the Supreme Court has recognized, mootness is "the doctrine of standing set in a time frame: the requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) (citation omitted) (internal quotation marks omitted).[4]

---

[4] In contending that we lack jurisdiction, Justice Stras's dissent argues that the district court's October order was an advisory opinion, which the court lacked the authority to issue. We disagree. As an initial matter, it is important not to lose sight of the fact that this case arises in the guardianship area, an area of law that does not contemplate adversity in the same way as a typical contested case. *See, e.g.*, *In re Guardianship of Spangler*, 933 N.E.2d 1067, 1074 (Ohio 2010) ("Guardianship proceedings . . . are not adversarial but rather are in rem proceedings involving only the probate court and the ward."); *In re Clendenning,* 60 N.E.2d 676, 680 (Ohio 1945) (noting that guardianship proceedings are not adversarial in nature); *see also Black's Law Dictionary* 913 (10th ed. 2014) (noting that the procedural phrase "in re" is used for judicial proceedings "not formally including adverse parties").

But even more importantly, the parties in this case were adverse at the district court, as they are here, with respect to the statutory interpretation question. Vogel, the guardian, argued below and argues here that he had the authority under Minn. Stat. § 524.5-313(c) to discontinue the ward's life-sustaining treatment without court authorization. Tschumy, the ward, argued that court approval was required. The case on which the dissent relies—*Schowalter v. State*, 822 N.W.2d 292 (Minn. 2012)—therefore is inapposite. *Id*. at 299 (holding that the adversity requirement was not met when "both parties agree[d]" on the disposition of the issue). The other case the dissent cites—*Seiz v. Citizens Pure Ice Co.*, 207 Minn. 277, 290 N.W. 802 (1940)—is likewise unhelpful. *Seiz* was a declaratory judgment action challenging the constitutionality of a statute relating to the provision on unemployment benefits. *Id.* at 277, 290 N.W. at 802. Because the plaintiff was employed and expected to remain so, we concluded that he was not entitled to unemployment benefits and his statutory argument was therefore purely theoretical. *Id*. at 283, 290 N.W. at 805. Moreover, we said that any dispute as to unemployment benefits would be between the employee or employer, on the one hand, and the state unemployment compensation fund on the other. The dispute would not be between the two parties in the case, the employee and his employer. *Id*. at 282, 290 N.W. at 804. For

(Footnote continued on next page.)

9

We have dismissed appeals for lack of jurisdiction where the issues in the case were moot. *E.g.*, *In re Inspection of Minn. Auto Specialties, Inc.*, 346 N.W.2d 657, 658 (Minn. 1984). We do so because courts are designed to decide actual controversies. *State v. Brooks*, 604 N.W.2d 345, 347 (Minn. 2000). We will also dismiss cases as moot

_____

(Footnote continued from previous page.)
these reasons, we concluded that the declaratory judgment action did not present a justiciable controversy. *Id.* at 285, 290 N.W. at 806. In this case, by contrast, the dispute before the district court was not theoretical. Vogel argued that he had the authority under the guardianship statute to discontinue the treatment at issue. Tschumy argued that further court approval was required. The district court's order resolved that actual, live controversy in the order that is the subject of this appeal. The dissent comes out differently because the dissent postures the case as involving just the question of whether Tschumy should be removed from life support. In addition to that question, however, the district court was also asked to decide whether, under the statute, Vogel needed court approval to remove Tschumy from life-sustaining treatment.

The dissent also relies on the fact that the district court authorized the removal of life-sustaining treatment in the May order to support the contention that the October order was an advisory opinion. This analysis is not persuasive. In the context of election disputes brought under Minn. Stat. § 204B.44 (2012), our court routinely issues our decision in order form with opinion to follow. *See, e.g.*, *Martin v. Dicklich*, 2012 WL 4465588, at *1-2 (Minn. filed Sept. 25, 2012). For example, in *Martin v. Dicklich*, a question was raised as to which name a county auditor should place on the election ballot after one candidate withdrew from the election. *Id.* Recognizing the necessity for a prompt resolution of the question, we issued a short order on September 25, 2012, directing the auditor to prepare new ballots for the election. *Id.* The end of the order said: "So as not to impair the orderly election process, this order is issued with opinion to follow." *Id.* at 2. More than 2 months later, after the election had been held, we issued our opinion. *Martin v. Dicklich*, 823 N.W.2d 336 (Minn. 2012). We have used a similar process in termination-of-parental rights cases. *See, e.g.*, *In re Children of S.E.P. and J.W.P.*, 744 N.W.2d 381, 382 n.1 (Minn. 2008) (noting that "we issued an order, with written opinion to follow, reversing the court of appeals and reinstating the district court's order terminating the rights of both parents"). The district court followed a similar process in this case. Just as our opinions in *Martin* and *S.E.P.* were not invalid advisory opinions, so too the district court's October order is not an invalid advisory opinion simply because it was issued after Tschumy had died.

10

if we are unable to grant effective relief. *In re Minnegasco*, 565 N.W.2d 706, 710 (Minn. 1997); *In re Schmidt*, 443 N.W.2d at 826.

We have not previously considered whether we should dismiss an appeal that arises in the unusual context presented here.[5] Several states have addressed the mootness issue in this context, however, and almost all of them have concluded that even though the person on life support had died pending an appeal, the appellate court should still resolve issues over the authority to order the discontinuation of life-sustaining treatment. *Rasmussen by Mitchell v. Fleming*, 741 P.2d 674, 680 (Ariz. 1987) (deciding question of whether guardian had authority to authorize removal of life-sustaining treatment even though ward died pending the appeal because case fell within exception to mootness doctrine); *see In re Guardianship of L.W.*, 482 N.W.2d 60, 64-65 (Wis. 1992) (same).[6]

---

[5]    In the only other case from our court where an issue was raised similar to that raised here, the order authorizing the removal of life-sustaining treatment was stayed pending appeal and the ward in that case was apparently kept alive pending appeal. *See In re Conservatorship of Torres*, 357 N.W.2d 332 (Minn. 1984).

[6]    *See also Bartling v. Superior Court,* 209 Cal. Rptr. 220, 221 (Cal. Ct. App. 1984); *John F. Kennedy Mem'l Hosp., Inc. v. Bludworth,* 452 So. 2d 921, 923 (Fla. 1984); *In re L.H.R.,* 321 S.E.2d 716, 718 (Ga. 1984); *Superintendent of Belchertown State Sch. v. Saikewicz,* 370 N.E.2d 417, 423 (Mass. 1977); *In re Conroy,* 486 A.2d 1209, 1219 (N.J. 1985); *Eichner v. Dillon,* 426 N.Y.S.2d 517 (N.Y. App. Div. 1980), *modified on other grounds sub nom., Matter of Storar,* 420 N.E.2d 64 (N.Y. 1981) *cert. denied, Storar v. Storar,* 454 U.S. 858 (1981); *In re Guardianship of Hamlin,* 689 P.2d 1372, 1374 (Wash. 1984).

Justice Stras's dissent argues that these cases are distinguishable from the case before us because in these cases, there was the "possibility that a court could order meaningful relief in favor of either the ward or the ward's estate." That distinction is simply not borne out by the cases. In all of these cases, the ward had died, so there was no possibility that the court's decision regarding the extent of his or her rights would

(Footnote continued on next page.)

11

These cases recognize that an appellate court has the authority to decide the question presented as an exception to the mootness doctrine.

Our precedent similarly permits us to exercise our discretion to consider a case that might be technically moot as an exception to our mootness doctrine. We have said that we have authority to decide cases that are technically moot when those cases are functionally justiciable and present important questions of statewide significance. *E.g.*,

---

(Footnote continued from previous page.)

affect the ward. *See, e.g.*, *Eichner*, 426 N.Y.S.2d at 523 ("In assessing our obligations at this point, we recognize that, because the profound and difficult issues which underlie this proceeding transcend the tragedy which befell Brother Fox, they have not perished with him."). Similarly, any interest the guardians may have had in these cases also ended with the ward's death. *See, e.g.*, Wis. Stat. § 54.64(3) (2014) ("A guardianship of the person shall terminate if . . . the ward dies."). Nonetheless, the courts relied on discretionary exceptions to their mootness doctrines, rather than any continuing interest the ward may have, to exercise jurisdiction. *See, e.g.*, *Rasmussen by Mitchell*, 741 P.2d at 680 ("This particular controversy became moot when Rasmussen died. We have discretion, however, to decide questions which have become moot."). Indeed, courts have chosen to exercise jurisdiction in almost every case that has arisen in the compelling context presented here, where a ward has died and the authority of the guardian to remove the ward from life-sustaining treatment is challenged. *See id.* at 681 ("Other jurisdictions have declined to rely on the death of the real party in interest and the mootness doctrine to avoid resolving issues raised in medical treatment cases. We follow in their footsteps and exercise our jurisdiction to confront the issues and reach the merits of this case."). The one exception that the dissent cites—*In re Riddlemoser*, 564 A.2d 812 (Md. 1989)—is inapposite. In *Riddlemoser*, the court first acknowledges that it has the authority to hear technically moot cases in "rare instances which demonstrate the most compelling of circumstances." *Id.* at 815 (citation omitted) (internal quotation marks omitted). But the court then declines to exercise its jurisdiction, because the ward's attorney, her guardians, and all the amici were "of one mind" on the statutory interpretation issue and all agreed that courts had the ability under the Maryland statute to order the withholding or withdrawal of medical treatment. *Id.* at 816. In other words, in *Riddlemoser*, there was "no party presenting a contrary argument" on the statutory issue. *Id.* We are not faced with similar agreement between the attorney for the ward, the guardian, and the amici before us in this case.

*State v. Rud*, 359 N.W.2d 573, 576 (Minn. 1984). Our mootness doctrine therefore is flexible and discretionary; it is not a mechanical rule that we invoke automatically. *Kahn v. Griffin*, 701 N.W.2d 815, 821 (Minn. 2005).[7] Our precedent illustrates our careful

---

[7] We are not alone in recognizing that we have authority to decide cases that might be technically moot as long as those cases present issues of significant public interest. The jurisprudence of 42 other states recognizes similar exceptions to the mootness doctrine, although the specific requirements of the exceptions vary from state to state. *See City of Birmingham v. Long*, 339 So. 2d 1021, 1023 (Ala. 1976); *Hayes v. Charney*, 693 P.2d 831, 834 (Alaska 1985); *Wise v. First Nat'l Bank*, 65 P.2d 1154, 1156 (Ariz. 1937); *Campbell v. State*, 846 S.W.2d 639, 640 (Ark. 1993); *Liberty Mut. Ins. Co. v. Fales*, 505 P.2d 213, 215 (Cal. 1973); *Humphrey v. Sw. Dev. Co.*, 734 P.2d 637, 639 (Colo. 1987); *McDermott Inc. v. Lewis*, 531 A.2d 206, 211 (Del. 1987); *Holly v. Auld*, 450 So. 2d 217, 218 n.1 (Fla. 1984); *United Pub. Workers v. Yogi*, 62 P.3d 189, 204 (Haw. 2002); *Idaho Sch. for Equal Educ. Opportunity v. State Bd. of Educ.*, 912 P.2d 644, 652 (Idaho 1996); *People ex rel. Wallace v. Labrenz*, 104 N.E.2d 769, 772 (Ill. 1952); *Ind. Educ. Employment Relations Bd. v. Mill Creek Classroom Teachers Ass'n*, 456 N.E.2d 709, 712 (Ind. 1983); *Rush v. Ray*, 332 N.W.2d 325, 326 (Iowa 1983); *Smith v. Martens*, 106 P.3d 28, 32 (Kan. 2005); *Brown v. Baumer*, 191 S.W.2d 235, 238 (Ky. 1946); *Campaign for Sensible Transp. v. Me. Tpk. Auth.*, 658 A.2d 213, 215 (Me. 1995); *Attorney Gen. v. Anne Arundel Cnty. Sch. Bus Contractors Ass'n, Inc.*, 407 A.2d 749, 752 (Md. 1979); *Lockhart v. Attorney Gen.*, 459 N.E.2d 813, 815 (Mass. 1984); *Mead v. Batchlor*, 460 N.W.2d 493, 496 (Mich. 1990), *abrogated on different grounds by Turner v. Rogers*, ___ U.S. ___, 131 S. Ct. 2507 (2011); *Allred v. Webb*, 641 So. 2d 1218, 1220 (Miss. 1994); *In re Marshall*, 478 S.W.2d 1, 5 (Mo. 1972); *State ex rel. Ronish v. Sch. Dist. No. 1 of Fergus Cnty.*, 348 P.2d 797, 800 (Mont. 1960); *Chambers v. Lautenbaugh*, 644 N.W.2d 540, 547 (Neb. 2002); *State v. Glusman*, 651 P.2d 639, 643 (Nev. 1982); *State v. Swift*, 143 A.2d 114, 116 (N.H. 1958); *State v. Perricone*, 181 A.2d 751, 755 (N.J. 1962); *Mowrer v. Rusk*, 618 P.2d 886, 889 (N.M. 1980); *Nat'l Org. for Women v. State Div. of Human Rights*, 314 N.E.2d 867, 869 (N.Y. 1974); *N.C. State Bar v. Randolph*, 386 S.E.2d 185, 186 (N.C. 1989); *Walker v. Schneider*, 477 N.W.2d 167, 169-70 (N.D. 1991); *Franchise Developers, Inc. v. City of Cincinnati*, 505 N.E.2d 966, 969 (Ohio 1987); *Payne v. Jones*, 146 P.2d 113, 116 (Okla. 1944); *Sagan ex rel. Registered Voters of the Commonwealth v. Pa. Pub. Television Network*, 544 A.2d 1309, 1310 n.2 (Pa. 1988); *In re New England Gas Co.*, 842 A.2d 545, 554 (R.I. 2004); *Sloan v. Friends of Hunley, Inc.*, 630 S.E.2d 474, 478 (S.C. 2006); *Anderson v. Kennedy*, 264 N.W.2d 714, 717 (S.D. 1978); *McCanless v. Klein*, 188 S.W.2d 745, 747 (Tenn. 1945); *Utah Transit Auth. v. Local 382 of Amalgamated Transit Union*, 289 P.3d 582, 589-90 (Utah 2012); *Sorenson v. City of Bellingham*, 496 P.2d 512, 518 (Wash. 1972);

(Footnote continued on next page.)

(Footnote continued from previous page.)
*Israel ex rel. Israel v. W. Va. Secondary Sch. Activities Comm'n*, 388 S.E.2d 480, 483 (W. Va. 1989); *In re Recall of Certain Officials of Delafield*, 217 N.W.2d 277, 279 (Wis. 1974); *In re RM*, 102 P.3d 868, 871 (Wyo. 2004).

Justice Stras's dissent attempts to discount the overwhelming weight of this support for our decision to exercise our discretion to resolve this case as an exception to the mootness doctrine by arguing—without citation to any authority—that these cases are distinguishable because the constitutions in these states do not have separation of powers provisions. The dissent's lack of citation is not surprising. In fact, all of these states recognize separation of powers principles similar to those reflected in the Minnesota Constitution, most due to express provisions in their constitutions. Ala. Const. art. III, §§ 42-43; Ariz. Const. art. III; Ark. Const. art. IV, §§ 1-2; Cal. Const. art. III, § 3; Fla. Const. art. II, § 3; Idaho Const. art. II, § 1; Ill. Const. art. II, § 1; Ind. Const. art. III, § 1; Iowa Const. art. III, § 1; Ky. Const. § 28; Me. Const. art III, §§ 1-2; Mass. Const. pt.1, art XXX; Mich. Const. art. III, § 2; Miss. Const. art. I, §§ 1-2; Mo. Const. art II, § 1; Mont. Const. art. III, § 1; Neb. Const. art II, § 1; Nev. Const. art. III, § 1; N.H. Const. pt.1, art. 37; N.J. Const. art. III, ¶ 1; N.M. Const. art. III, § 1; N.C. Const. art. I, § 6; N.D. Const. art. XI, § 26; Okla. Const. art. IV, § 1; R.I. Const. art. V; S.C. Const. art. I, § 8; S.D. Const. art. II; Tenn. Const. art. II, §§ 1-2; Utah Const. art. V, § 1; W. Va. Const. art. V, § 1; *State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc.*, 28 P.3d 904, 913 (Alaska 2001) ("The separation of powers doctrine and its complementary doctrine of checks and balances are implicit in the Alaska Constitution."); *Haw. Insurers Council v. Lingle*, 201 P.3d 564, 582-83 (Haw. 2008) ("The separation of powers doctrine is not expressly set forth in any single constitutional provision . . .[but Hawaii's sovereign power] is divided and allocated among three co-equal branches. The doctrine provides that a department may not exercise powers not so constitutionally granted, which from their essential nature, do not fall within its division of governmental functions, unless such powers are properly incidental to the performance by it of its own appropriate functions." (citations omitted) (internal quotation marks omitted)); *State ex rel. Morrison v. Sebelius*, 179 P.3d 366, 374 (Kan. 2008) ("The separation of powers doctrine is not expressly stated in either the United States or Kansas Constitutions. Yet, the doctrine is recognized as an inherent and integral element of the republican form of government." (citation omitted) (internal quotation marks omitted)); *Clark v. Cuomo*, 486 N.E.2d 794, 797 (N.Y. 1985) ("The doctrine of separation of powers is implied by the separate grants of power to each of the coordinate branches of government."); *City of S. Euclid v. Jemison*, 503 N.E.2d 136, 138 (Ohio 1986) ("While Ohio, unlike other jurisdictions, does not have a constitutional provision specifying the concept of separation of powers, this doctrine is implicitly embedded in the entire framework of those sections of the Ohio Constitution that define the substance and scope of powers granted to the three branches of state government." (citations omitted) (internal quotation

(Footnote continued on next page.)

14

analysis of all aspects of the issues presented before we determine whether to dismiss the case or exercise our discretion to consider the appeal as an exception to the mootness doctrine.

For example, in *State v. Rud*, the question presented was whether a defendant, accused of criminal sexual conduct, could compel the alleged child victims and other potential child witnesses to testify at the defendant's omnibus hearing. 359 N.W.2d at 575. The district court concluded that the defendant did not have the right to subpoena these witnesses, but the court of appeals reversed. *Id*. After we granted the State's petition for review, the State dismissed the charges against the defendant. *Id.* at 576. Even though there was no longer a live controversy between the parties, we declined to dismiss the appeal and instead resolved the question presented in the case. *Id*. We did so

---

(Footnote continued from previous page.)

marks omitted)); *Jefferson Cnty. Court Appointed Empys' Ass'n v. Pa. Labor Relations Bd.*, 985 A.2d 697, 706 (Pa. 2009) ("[T]o maintain the independence of the three branches of government, our system embodies a separation of powers."); *Hale v. Wellpinit Sch. Dist. No. 49*, 198 P.3d 1021, 1025-26 (Wash. 2009) ("Separation of powers create[s] a clear division of functions among each branch of government, and the power to interfere with the exercise of another's functions [is] very limited . . . The principle of separation of powers was incorporated into the Washington State Constitution in 1889."); *State ex rel. Friedrich v. Circuit Court for Dane Cnty.*, 531 N.W.2d 32, 36 (Wis. 1995) ("The doctrine of separation of powers, while not explicitly set forth in the Wisconsin constitution, is implicit in the division of governmental powers among the judicial, legislative and executive branches."). The dissent also argues that the cases are distinguishable because some jurisdictions authorize their judiciary to issue advisory opinions. Only seven of the 42 states provide in their constitutions that the judiciary may issue advisory opinions. *See* Fla. Const. art. V, § 3; Me. Const. art. VI, § 3; Mass. Const. pt. 2, ch. 3, art. 2; Mich. Const. art. III, § 8; N.H. Const. pt. 2, art. 74; R.I. Const. art 10, § 3; S.D. Const. art. V, § 5. The absence of this authority in Minnesota is not relevant to this case, however, because, as explained above, the district court did not issue an advisory opinion.

15

because the case was "functionally justiciable," and "the issues presented are important public issues of statewide significance that should be decided immediately." *Id*.

With respect to the first requirement, we said that "[a] case is functionally justiciable if the record contains the raw material (including effective presentation of both sides of the issues raised) traditionally associated with effective judicial decision-making." *Id*. We held that the requirement was met, noting the quality of both parties' arguments and the fact that the parties "agree[d] that the appeal should not be dismissed as moot." *Id*. In discussing the second requirement, we expressed concern about the "adverse impact" that could occur in pending criminal cases if we declined to resolve the issues in *Rud* but were to wait for those issues to be presented in a future case. *Id*. Based on that concern and the importance of the issues presented, we exercised our discretion to decide those issues in *Rud*. *Id*.

We reached the same conclusion in *Jasper v. Commissioner of Public Safety*, 642 N.W.2d 435 (Minn. 2002). In that case, a driver whose license was revoked challenged the revocation, contending that the commissioner's rule approving use of the equipment at issue was not valid. *Id*. at 436. The district court rejected the challenge and the court of appeals affirmed. *Id*. After we granted the driver's petition for review, the commissioner promulgated a new rule approving the use of the equipment at issue. *Id*. at 439 n.4. The promulgation of the new rule led us to consider whether we should dismiss the appeal as moot. *Id*. at 439. Because the record "contain[ed] detailed information regarding" the equipment at issue and "the parties ably briefed and argued the issue of whether [the equipment] was properly approved" by the earlier rule, we held that the

issue was functionally justiciable. *Id.* We also concluded that the equipment at issue in the case "[was] the only breath-testing instrument currently in use in this state, and there has been substantial litigation in the district courts as to whether the instrument was properly approved." *Id.* Based on this analysis, we determined that the issue presented in *Jasper* was "one of public importance and statewide significance that should be decided immediately," and proceeded to the merits. *Id.* at 439-40; *see also State v. Matthews*, 779 N.W.2d 543, 548 (Minn. 2010) (exercising discretion to decide a jury instruction issue "related to an unadjudicated jury verdict" because the issue was functionally justiciable and "one of public importance and statewide significance"). [8]

We reached the opposite conclusion in *Limmer v. Swanson*, 806 N.W.2d 838, 839 (Minn. 2011). Even though the two requirements of functional justicability and an

---

[8] Justice Stras's dissent accuses that we "aggrandize" our power. The dissent is wrong. We ground our decision in our precedent, as is our obligation. The dissent's apparent disagreement with our precedent that recognizes and applies exceptions to the mootness doctrine does not provide a basis for us to ignore that precedent. Indeed, even one of the cases the dissent cites recognizes that we have the authority to decide moot issues as an exception to the mootness doctrine. *In re Schmidt*, 443 N.W.2d 824, 826 (Minn. 1989). The authority is well recognized in our cases and, unlike the dissent, we are not willing to discard it. To be sure, the dissent attempts to distinguish *Rud*, *Jasper* and *Matthews*, because, according to the dissent, the district courts in those cases did not issue advisory opinions. But this distinction is nonexistent because the district court in this case did not issue an advisory opinion. The other cases that the dissent discusses are likewise not helpful to the analysis here because these cases do not discuss or apply the exceptions we have recognized to our mootness doctrine. *See Sinn v. City of St. Cloud,* 295 Minn. 532, 203 N.W.2d 365 (1972); *Doyle v. Ries*, 205 Minn. 82, 285 N.W. 480 (1939); *Works v. Tiber*, 169 Minn. 172, 210 N.W. 877 (1926); *In re Application of the Senate*, 10 Minn. 78 (Gil. 56) (1865). The question presented here is not whether the statutory interpretation issue raised in the case is moot because Tschumy has died. The question instead is whether we should exercise our discretion to take jurisdiction to decide the issue under one of our well-recognized exceptions to the mootness doctrine.

17

important public issue of statewide significance existed, we declined to exercise our jurisdiction and dismissed the case as moot. *Id.* The question presented in *Limmer* was whether the judiciary could authorize certain expenditures by the executive branch in the absence of legislative appropriations. *Id.* at 838. While the case was pending, the Legislature passed and the Governor signed into law appropriations bills for all executive branch agencies covering the time period in question in the case. *Id.* at 838-39. We agreed that we had the authority to decide the case. *Id.* at 839. But we declined to exercise that authority because the case presented "fundamental constitutional questions about the relative powers of the three branches of our government" and because of our reluctance to resolve such questions " 'unless it is necessary to do so.' " *Id.* (quoting *State v. N. Star Research Dev. Inst.*, 294 Minn. 56, 81, 200 N.W.2d 410, 425 (1972)). Rather than exercising our discretion to decide the constitutional question, we deferred to the ability of the executive and legislative branches to "put mechanisms in place that would ensure that" the issue presented in the case did not arise in the future. *Id.*

### B.

With these cases in mind, we turn to the jurisdictional question presented here. Our analysis in the cases discussed above where we interpreted our mootness doctrine leads us to conclude that we should exercise our discretion to decide the issue raised in this case. The question of whether a guardian needs prior court approval to consent to the removal of life-sustaining treatment is functionally justiciable. The question was ably briefed and argued by the parties and the record contains the factual information necessary for a decision. In addition, there was thoughtful and informative amicus

18

support for the position that each party advocated. We likely would not have any more information at our disposal if we were to wait for another case to present the same issue. *See Rud*, 359 N.W.2d at 576 ("[R]ather than waiting for another case presenting these same issues, which are now properly before us and ready for decision, we decide them now.").

In addition, this case presents an important public issue of statewide significance. Guardianship law exists as a function of the State's parens patriae[9] power to protect "infants and other persons lacking the physical and mental capacity to protect themselves." *In re Pratt*, 219 Minn. 414, 422, 18 N.W.2d 147, 152 (1945). The State possesses this protective power as "an attribute of sovereignty" and exercises it in the manner provided by statute. *Id.* at 422, 18 N.W.2d at 152. Courts play a vital role in supervising guardians as they exercise the power of the State to watch over Minnesota's most vulnerable citizens. *See* Minn. Stat. § 524.5-313(a) (stating that guardians are "subject to the control and direction of the court at all times and in all things"). Not only does this case involve this special area of law, but it also involves issues of life and natural death and the ability of incapacitated Minnesotans to exercise self-determination when it comes to declining further medical treatment.

The impact of uncertainty on such an important question also counsels in favor of exercising our discretion to resolve this issue in this case. The district court's May order

---

[9] Parens patriae is defined as "the state in its capacity as provider of protection to those unable to care for themselves." It translates from Latin as "parent of his or her country." *Black's Law Dictionary* 1287 (10th ed. 2014).

19

notes "that there are thousands of guardians in Minnesota holding the same power that Mr. Vogel has." And in her amicus brief, the Attorney General represents that there are over 12,000 wards under State supervision in Minnesota. A decision from our court will help clarify for the guardians and their wards the scope of the guardians' authority to make one of life's most fundamental decisions.

We acknowledge the possibility that the issue presented here could arise in a future case. After all, the essence of the question presented in this case has been before our court previously. *See In re Conservatorship of Torres*, 357 N.W.2d 332 (Minn. 1984). In that case, the district court authorized a conservator to remove life-sustaining treatment, but the court stayed the operation of its order pending appeal. *Id*. at 336. We did not issue our opinion until 7 months after the district court stayed the operation of its order. The record in this case convinces us that the procedure used in *Torres* is not the path that best serves the welfare of the person under the State's protection and supervision. *Id*. at 338 ("Under Minnesota law, a probate court must act in the 'best interests' of the ward or conservatee in a guardianship proceeding." (*quoting In re Schober*, 303 Minn. 226, 230, 226 N.W.2d 895, 898 (1975))); *see also State ex rel. Raymond v. Lawrence*, 86 Minn. 310, 312, 90 N.W. 769, 770 (1902) ("The welfare of the ward is the chief matter to be considered.").

Indeed, the procedure used in *Torres*, which required the ward to be kept alive, would be unjust and unnecessarily cruel had it been forced upon Tschumy. This is so because even during the brief period that the district court deliberated about whether to allow the hospital to remove Tschumy from life support systems, the evidence was that

20

Tschumy suffered continual seizures that could not be controlled unless his physicians forced him, through medication, further into unconsciousness: into "deep sedation." And according to the physicians, continuing medical intervention was not only "futile," but was likely "harmful" to Tschumy. The sound exercise of judicial discretion does not permit us to ignore the potential harm that the most vulnerable would face were we to dismiss this case in the name of preserving for appellate review the purity of an active controversy in a future case.[10]

Because this case is functionally justiciable and the issue presented is one of public importance and statewide significance that we should decide now, our precedent provides us with the authority to decide this case even though it is technically moot. *See, e.g., Rud*, 359 N.W.2d at 576. The reasons we discuss above that favor the exercise of this discretion are compelling. And, unlike in *Limmer*, there are no countervailing constitutional and prudential considerations warranting a decision not to exercise jurisdiction in this case. *See* 806 N.W.2d at 839. The prudential considerations weigh

---

[10] Justice Stras's dissent acknowledges that the statutory interpretation issue presented in this case is a "legal issue with statewide importance." The dissent nevertheless blusters that we are behaving as a "junior varsity legislature" because we are "making a pure policy decision" that "ignores the fundamental limitations on our authority." Interpreting statutes, however, is work the judicial branch has been doing since our State was founded. *See, e.g., Olson v. Nelson*, 3 Minn. 53 (Gil. 22) (1859). And in doing this work of statutory interpretation, we do not make public policy; we attempt to interpret the policy that the Legislature has already determined in the statutory language at issue. *See, e.g., Haefele v. Haefele*, 837 N.W.2d 703, 708 (Minn. 2013) ("The purpose of all statutory interpretation is to ascertain and effectuate the intention of the Legislature."). We do nothing more in this case.

heavily in favor of exercising jurisdiction in the unusual context presented here, given

that it is our obligation to afford paramount consideration to the "welfare" of the ward.

*Lawrence*, 86 Minn. at 312, 90 N.W. at 770.  We therefore hold that we have jurisdiction

and turn to the merits of the case. [11]

II.

We are asked to decide whether a guardian appointed under Minn. Stat. § 524.5-

313(c)(4)(i) has the authority to make a decision to discontinue a ward's life-sustaining

treatment without first seeking a court order.  This is a question of statutory interpretation

that we review de novo.  *In re Welfare of J.B.*, 782 N.W.2d 535, 539 (Minn. 2010).

The statute generally authorizes the district court to appoint a guardian for an

"incapacitated person" in need of assistance with decision making.  Minn. Stat. § 524.5-

---

[11]    The court of appeals, while recognizing that this case "involves an important
public issue of statewide significance," relied on the exception to our mootness
jurisprudence that allows courts to hear cases that are capable of repetition, yet evade
review.  *In re Guardianship of Tschumy*, A12-2179, Order at 4 (Minn. App. filed Feb. 20,
2013).  In holding that we have jurisdiction to hear this case, however, we do not rely on
the "capable of repetition, yet evading review" exception.  Rather, we rely on the separate
exception that allows us to hear cases that are functionally justiciable and present
important public issues of statewide significance.  *See Kahn v. Griffin*, 701 N.W.2d 815,
821-22 (Minn. 2005) (discussing "capable of repetition, yet evading review" and
"functionally justiciable and . . . an important public issue of statewide significance" as
two separate exceptions to our mootness jurisprudence (citations omitted) (internal
quotation marks omitted)).

Justice Stras's dissent mistakenly refers to this portion of the opinion as a
"plurality."  Four members of the court agree that we have jurisdiction to decide the
statutory interpretation question presented in this case.  Accordingly, the jurisdiction
section of this opinion is the opinion of the court, not of a plurality.

22

313(c). Guardians so appointed are "subject to the control and direction of the court at all times and in all things." Minn. Stat. § 524.5-313(a) (2012). And the statute authorizes the court to "grant to a guardian only those powers necessary to provide for the demonstrated needs of the ward." Minn. Stat. § 524.5-313(b) (2012).

Paragraph (c) in the statute is the focus of the dispute here. This provision provides:

> The duties and powers of a guardian or those which the court may grant to a guardian include, but are not limited to:
>
> . . .
>
> > (4)(i) the power to give any necessary consent to enable the ward to receive necessary medical or other professional care, counsel, treatment, or service, except that no guardian may give consent for psychosurgery, electroshock, sterilization, or experimental treatment of any kind unless the procedure is first approved by order of the court as provided in this clause. The guardian shall not consent to any medical care for the ward which violates the known conscientious, religious, or moral belief of the ward[.]

Minn. Stat. § 524.5-313(c).

Section 524.5-313(c)(4)(i) gives guardians "the power to give any necessary consent to enable the ward to receive necessary medical or other professional care, counsel, treatment, or service." The essence of the parties' dispute is whether the medical-consent power includes the authority to direct that a ward be removed from life support systems. Vogel argues that it does.

For his part, Tschumy, through his attorney, contends that the statute does not give guardians the power to authorize the removal of life support systems. He offers several arguments in support of that contention. Tschumy argues that because decisions

23

regarding life support are so significant, the district court must specifically authorize them. Tschumy next argues that because life-sustaining treatment was not necessary when the district court appointed his guardian, the guardian therefore does not have the power to withdraw such treatment. And Tschumy contends that because the decision to remove a ward from life support systems includes more than simply a medical decision, the medical-consent power in the statute does not cover decisions to discontinue life support. Finally, Tschumy argues that his right to due process compels the conclusion that his guardian did not have the authority to remove him from life support. We consider each of Tschumy's arguments in turn.[12]

## A.

We turn first to Tschumy's argument that because the authority to make decisions regarding life and death matters is so significant, the guardian does not have the authority to make those decisions in the absence of an express grant of authority over such decisions. Specifically, Tschumy argues that under Minn. Stat. § 524.5-313(c)(4)(i), the duties and powers of guardians "clearly and unambiguously do not include the power to terminate life support services," and that a decision by a guardian that "results in the

---

[12] Tschumy also argues, in the alternative, that if we were to conclude that Minn. Stat. § 524.5-313(c)(4)(i) is ambiguous, various canons of statutory construction and relevant legislative history support his contention that court approval was required to discontinue his life-sustaining treatment. Because we conclude, as set forth below, that the plain language of the statute gives the guardian authority to consent to the discontinuation of Tschumy's life-sustaining treatment, we do not reach these alternative arguments.

death of a ward" is "better dealt with as an additional power that the court may grant above and beyond the listed powers in the statute." We are not persuaded.

It is true, as Tschumy argues, that the statute does not directly address decision making regarding the provision of life-sustaining treatment through use of the words "withdraw," "discontinue" or "terminate." But Tschumy does not contend that the treatment at issue is not medical treatment, and he apparently agrees that Vogel had the authority, under Minn. Stat. § 524.5-313(c)(4)(i), to consent to Tschumy being placed on the life support systems. Tschumy argues, in essence, that the authority to discontinue such treatment, because of the consequences of such a decision, leads to the conclusion that the guardian lacks the authority to make the decision to discontinue the treatment. We disagree.

To adopt Tschumy's reading, we would have to conclude that the power to "consent" to necessary medical treatment does not include the power to withdraw that consent. The plain and ordinary meaning of "consent" is "[a]greement, approval, or permission as to some act or purpose, esp. given voluntarily by a competent person; legally effective assent." *Black's Law Dictionary* 368 (10th ed. 2014). The concept of "consent" is premised on the idea of voluntary decision making, which necessarily includes the ability to choose to say "no." Indeed, when the continued medical treatment of the ward is no longer necessary and no longer in the best interests of the ward because the ward has no reasonable chance to recover, the guardian has not just the ability but likely the duty to decline to consent to continuing medical treatment that harms the ward. *See In re Guardianship of Overpeck*, 211 Minn. 576, 583, 2 N.W.2d 140, 144 (1942)

25

("The best interests of the ward should be the decisive factor in making any choice on his behalf.").

A contrary reading of the statute eliminates this duty and it would lead to a fragmentation of the power of consent that could allow health care providers to subject wards to useless medical procedures simply because the guardian would not have the power to withdraw consent to further treatment. Such a result would, in effect, "reduce the guardian's control over medical treatment to little more than a mechanistic rubberstamp for the wishes of the medical treatment team." *Rasmussen by Mitchell v. Fleming*, 741 P.2d 674, 688 (Ariz. 1987); *see also In re Lawrence*, 579 N.E.2d 32, 39 (Ind. 1991) ("This right to consent to the patient's course of treatment necessarily includes the right to refuse a course of treatment."); *In re Riddlemoser*, 564 A.2d 812, 816 n.4 (Md. 1989) (holding that by necessary implication, the power to give consent for medical treatment "includes the power to withhold or withdraw consent"). In other words, reading "consent" as not including the authority to withdraw consent to life-sustaining treatment is not a reasonable interpretation of section 524.5-313(c)(4)(i). *See Savela v. City of Duluth*, 806 N.W.2d 793, 797 n.1 (Minn. 2011) (rejecting alternative reading of statute as unreasonable and concluding statute was not ambiguous).

Tschumy's reading of section 524.5-313(c)(4)(i) is also inconsistent with our precedent. We have held that it would be unreasonable to interpret the guardianship statute to mean that guardians must "obtain express approval for every act relating to the personal care and custody of the ward's person." *Grier v. Estate of Grier*, 252 Minn. 143, 147, 89 N.W.2d 398, 402 (1958). Although a guardian is accountable to the court

26

for his acts, "his statutory authority is not to be construed—in absence of express language so requiring—as placing him in a legal straitjacket which deprives him of all discretion and flexibility in meeting the needs of the ward." *Id.* at 148, 89 N.W.2d at 402-03. Rather, guardianship statutes "are designed to provide flexibility and adaptability in caring for the ward according to his changing needs." *Id.* at 148, 89 N.W.2d at 403. Reading the statute the way Tschumy does is inconsistent with our analysis in *Grier*.

In addition, many decisions about medical treatment, such as consent to certain surgeries or treatments with grave side effects, could be characterized as involving life and death determinations. If we were to adopt Tschumy's reading of the statute, all of these types of medical decisions would require separate court approval unless each was specified in the guardian's appointment order. There is no basis in the statutory language for such a restrictive reading of the broad medical consent power. The plain language of the statute supports the opposite conclusion. This is so because where the Legislature intended specific court approval for certain types of treatment, the Legislature expressly provided for that approval in the statute. *See* Minn. Stat. § 524.5-313(c)(4)(i) (requiring specific court approval "for psychosurgery, electroshock, sterilization, or experimental treatment of any kind").

Tschumy relies on this same statutory language and argues that the language requiring court approval before a guardian may consent to psychosurgery, electroshock, sterilization, or experimental treatment of any kind supports the conclusion that guardians should similarly be required to seek court approval before removing life support. He

27

contends that because these extraordinary powers "are by their nature, life changing with permanent and unknown consequences and side effects," terminating life support "should be in the same category." This argument, however, is fundamentally a policy argument rather than one based on the language of the statute.

The statute uses very broad language, providing the guardian with authority to give any necessary consent for necessary medical care and treatment, except for the four listed types of treatment that require court approval. Minn. Stat. § 524.5-313(c)(4)(i). The statutory language confirms that the Legislature did not intend that guardians come back to court to receive specific court permission to consent to the removal of a ward's life support. *See also In re Welfare of Colyer*, 660 P.2d 738, 747 (Wash. 1983) (declining to read the withdrawal of life-sustaining treatment into the Washington statute enumerating four exceptions to a guardian's authority to make medical decisions).

Tschumy also argues that our decision in *In re Torres* compels the conclusion that the guardian did not have the authority to authorize removal from life support. 357 N.W.2d 332. In our view, *Torres* does not compel either result the parties advocate. In *Torres*, we held that probate courts have the authority to authorize the removal of life support from a comatose ward, even though the removal could result in the ward's death. *Id.* at 337. We found authority for the court to do so in myriad sources, including the Minnesota Constitution, the Patients' Bill of Rights, and the statutory language of what is now Minn. Stat. § 524.5-313(c)(4)(i). *Torres*, 357 N.W.2d at 337-38.

We declined to say whether the medical-consent provision alone could provide the court with statutory authority to authorize the removal of life support. Citing the

medical-consent provision, Torres's court appointed counsel argued that the conservator[13] "may only be given the power to consent to necessary medical care," and argued that "a conservator's order to remove a conservatee's life supports is not a 'consent to necessary medical care.'" *Id.* at 337. We said that this argument "*may* accurately describe the scope of a conservator's power if the conservator is granted *only* [the medical-consent power.]" *Id.* (emphasis added). We then noted that a court has the statutory power to grant greater authority than that specifically listed in the statute. *Id.* Thus, in *Torres* we held that even if the medical-consent provision does not provide authority for a district court to authorize removal from life support, such authority existed elsewhere in the statute. *Id.* Because we never specifically ruled on the scope of the medical-consent provision, *Torres* does not support the conclusion that a guardian does not have the power to order a ward to be removed from life support when the court has granted the guardian the medical-consent power outlined in Minn. Stat. § 524.5-313(c)(4)(i).

B.

We turn next to Tschumy's argument that the guardian did not have the authority to agree to remove Tschumy from life support because Tschumy did not need

---

[13] The statute at the time used the term "conservator" as well as "guardian," but *Torres*'s use of the word "conservator" is synonymous with the use of the word "guardian" in today's statute. *Compare* Minn. Stat. § 525.56, subd. 2 (1982) ("The court shall grant to a guardian or conservator only those powers necessary to provide for the demonstrated needs of the ward or conservatee."), *with* Minn. Stat. § 524.5-313(b) (2012) ("The court shall grant to a guardian only those powers necessary to provide for the demonstrated needs of the ward.").

life-sustaining treatment when the district court appointed the guardian. Specifically, Tschumy argues that under the statute, guardians possess only those powers that the district court grants, and district courts have the authority to grant only those powers that are "necessary" to take care of the "demonstrated needs" of the ward. Minn. Stat. § 524.5-313(b). According to Tschumy, the removal of life support was not one of his "demonstrated needs" at the time the guardian was appointed, and therefore, that power was not granted to his guardian. In addition, Tschumy argues that the court has the power to control and direct the guardian "at all times and in all things," so it is reasonable to conclude that the court can request the guardian to appear in court sometime after the initial appointment proceeding. *See* Minn. Stat. § 524.5-313(a); *In re Guardianship of Mikulanec*, 356 N.W.2d 683, 688 (Minn. 1984) (courts limit powers to the "least amount of power necessary to protect a potential ward in the individual case").

Tschumy's position misinterprets the "demonstrated need" of the ward. The "demonstrated need" of a ward for whom the medical-consent power is granted is that he or she is incapable of making medical decisions and cannot meet his or her medical needs. *See* Minn. Stat. § 524.5-313(c) (giving the court the authority to "appoint a guardian if it determines" the powers listed "are needed to provide for the needs of the *incapacitated person*" (emphasis added)); Minn. Stat. § 524.5-102, subd. 6 (2012) (defining an "incapacitated person" as a person who "lack[s] sufficient understanding or capacity to make or communicate responsible personal decisions, and who has demonstrated deficits in behavior which evidence an inability to meet personal needs for medical care"). The "demonstrated need" is not limited to the specific medical

30

conditions the ward has at the time the guardian is appointed.[14] *See Grier*, 252 Minn. at 148, 89 N.W.2d at 402-03 (discussing the guardian's "flexibility in meeting the needs of the ward").

When the social worker at Tschumy's nursing facility petitioned the district court to appoint a guardian for him, she primarily contended that Tschumy "lack[ed] sufficient understanding or capacity to make or communicate responsible decisions concerning his person," had "demonstrated behavioral deficits evidencing [an] inability to meet his needs for medical care," and was "facing multiple medical issues and [was] unable to make informed medical decisions." *See also Mikulanec*, 356 N.W.2d at 687 ("She lacks sufficient understanding to make a responsible decision concerning the choice of a mate and therefore is incapacitated under the court's findings."). The court then found that Tschumy was not adequately managing his diabetes, and that he was "incapable" of exercising the ability to consent to medical care. Tschumy's "demonstrated need" was assistance in making medical decisions. At the time Vogel was considering whether to discontinue Tschumy's life-sustaining treatment, Tschumy was entirely unable to make medical decisions for himself. The decision at issue therefore falls within the authority the district court gave to Tschumy's guardian.

---

[14] Consider, for example, a guardian who is appointed for a ward who has developmental disabilities and is therefore unable to make medical decisions for herself or meet her medical needs but who has no other medical conditions. Under Tschumy's position, a guardian given the medical-consent power for this ward would be able to make medical decisions related only to the ward's development disabilities. If the ward later developed cancer or broke her leg, the guardian would need to get a court order to make medical decisions for these conditions as well.

31

## C.

We next consider Tschumy's contention, advanced at oral argument, that the medical-consent power in Minn. Stat. § 524.5-313(c)(4)(i) cannot include the ability to remove a ward from life support because such a decision encompasses much more than medical decision making. We disagree.

We certainly recognize that once medical decision making enters the arena of life and death decisions, different interests are at stake. Such decision making could implicate moral and religious considerations, and most importantly, the decision, once it is made, is a permanent decision. *See Torres*, 357 N.W.2d at 341 (recognizing that the medical profession's ability to artificially maintain life "creates a wide variety of legal, medical, and ethical problems"); *see also Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 277 (1990) (recognizing that when dealing with questions over the right to refuse medical treatment, all agree that the issue presents "a perplexing question with unusually strong moral and ethical overtones"). But many "medical decisions" involve a moral or ethical component, regardless of whether life and death is involved. The Legislature recognizes this, by requiring that the guardian not consent to medical care on behalf of the ward if such care "violates the known conscientious, religious, or moral belief of the ward." *See* Minn. Stat. § 524.5-313(c)(4)(i). The fact that important interests are at stake therefore does itself not move the decision making from the guardian to a district court.

## D.

Finally, we turn to Tschumy's argument that the U.S. and Minnesota Constitutions support his reading of the statute. Specifically, he argues that the due process rights of

32

wards would be violated if we were to interpret the statute as authorizing guardians to consent to the removal of life-sustaining treatment without first obtaining express approval for that removal from the district court.  We are not convinced.

Both the United States and Minnesota Constitutions guarantee that the State cannot interfere with a person's right to life, liberty, or property without due process of law.[15]  U.S. Const. amend XIV, § 1; Minn. Const. art. I, § 7.  And while guardians may be "state actors" for the purpose of determining if there has been a due process violation,[16] the State will not actually be depriving a ward of life without due process of law if a guardian pursuant to lawful authority, decides to remove life support without first seeking court approval.  There is a fundamental difference between depriving someone of life and letting disease run its course.  As the Supreme Court of Wisconsin noted, while the withdrawal of a woman's feeding tube would certainly result in her death, "it is equally indisputable that the result is the natural death of the body, as contrasted to the

---

[15]     Due process protections provided under the Minnesota Constitution are "identical" to the due process guaranteed under the U.S. Constitution.  *Sartori v. Harnischfeger Corp.*, 432 N.W.2d 448, 453 (Minn. 1988).

[16]     When a due process violation is alleged, a court must first determine whether the asserted violation was caused by state action.  *State v. Beecroft*, 813 N.W.2d 814, 837 (Minn. 2012).  The State appoints guardians as a function of its parens patriae power to protect "infants and other persons lacking the physical and mental capacity to protect themselves."  *In re Pratt*, 219 Minn. 414, 422, 18 N.W.2d 147, 152 (1945).  Traditionally, the State delegates the performance of this relationship via the guardianship statutes.  *Id.* at 422, 18 N.W.2d at 152; s*ee also Thomas S. v. Morrow*, 781 F.2d 367, 377-78 (4th Cir. 1986) (finding that a guardian was a "state actor" for purposes of a federal civil rights lawsuit under 42 U.S.C. § 1983 because the guardian "acted together with or has obtained significant aid from state officials); *In re Guardianship of L.W.*, 482 N.W.2d 60, 71 (Wis. 1992) (recognizing that a guardian is a

(Footnote continued on next page.)

33

unnatural prolongation of, in this case, a vegetative state. The [S]tate does not deprive an individual of life by failing to ensure that every possible technological medical procedure will be used to maintain that life." *In re Guardianship of L.W.*, 482 N.W.2d 60, 71 (Wis. 1992); *see also John F. Kennedy Mem'l Hosp., Inc. v. Bludworth*, 452 So. 2d 921, 924 (Fla. 1984) ("The issue in these cases is not whether a life should be saved. Rather, it is how long and at what cost the dying process should be prolonged.").

E.

Based on our analysis, we hold that a guardian given the medical-consent power in Minn. Stat. § 524.5-313(c)(4)(i), has the authority to authorize removal of a ward's life-sustaining treatment, without court approval, when all interested parties agree that removal is in the ward's best interest. As we noted in *Torres*, family members of comatose patients make the sort of decision that underlies this case with no court involvement. 357 N.W.2d at 341 n.4. Subjecting wards to a different standard, one that often results in extended suffering for the unconscious ward, is unnecessary and potentially cruel when all the parties agree that ending life support and allowing natural death is the appropriate action.

We understand and share Justice Anderson's concern for the well-being of incapacitated wards, particularly those who as here, have no family or friends to speak for them. Nothing we say in this opinion should be viewed as prohibiting any interested

(Footnote continued from previous page.)
state actor because a guardian's authority "derives from the state's parens patriae power and is purely statutory").

family member or employee of the hospital or other health care facility from looking to the courts if there is a dispute over what is in the ward's best interest. When there is no dispute, however, about what the ward would have wanted, or what is in the best interests of the ward, court involvement adds little to the process. Courts are "ill-equipped to pass judgment on the specialized expertise required of a physician, particularly when such a decision is likely to have a direct impact on human life." *Campbell v. St. Mary's Hosp.*, 312 Minn. 379, 389, 252 N.W.2d 581, 587 (1977). The district court, of course, has the authority to intervene when the interested parties disagree about the appropriate course of action. But in this case, when the guardian, the involved medical staff, and the hospital ethics committee all agreed that it was in Tschumy's best interest to discontinue life-sustaining treatment, the guardian did not need prior court approval to consent to discontinuation of that treatment.

Affirmed.


DIETZEN, J., took no part in the consideration or decision of this case.

D I S S E N T

ANDERSON, Justice (dissenting).

I begin by noting that today we announce a very narrow rule of law involving a ward with no family or friends to speak for him. The majority concludes that a guardian in such a situation has the ability to order the termination of the ward's life-sustaining medical care, and that this power is implicit in the guardian's ability to give consent for necessary medical treatment and so does not require specific authorization by a district court. For the reasons stated below, I respectfully disagree. More importantly, I worry that the consequences of this rule of law are not so limited.

I.

I turn first to the statutory interpretation issues and conclude that the language of the statute does not authorize the guardian to make a decision to terminate end-of-life medical care.

A.

We look first to the plain language of the statute, because if, as the majority claims, the language of the statute is unambiguous, no further analysis is required. *In re PERA Police & Fire Plan Line of Duty Disability Benefits of Brittain*, 724 N.W.2d 512, 516 (Minn. 2006) ("If the statute is not ambiguous, the inquiry ends there."). The powers and duties of a guardian are governed by Minn. Stat. § 524.5-313 (2012). The statute provides that "[a] guardian shall be subject to the control and direction of the court at all times and in all things," Minn. Stat. § 524.5-313(a), and that "[t]he court shall grant to a guardian only those powers necessary to provide for the demonstrated needs of the

D-1

ward," Minn. Stat. § 524.5-313(b). Minnesota Statutes § 524.5-313(c) also details some of the powers that a court can grant to a guardian, noting that the list is not exclusive. One of the enumerated powers, found in Minn. Stat. § 524.5-313(c)(4)(i), is the guardian's ability to "give any necessary consent to enable the ward to receive necessary medical or other professional care, counsel, treatment, or service." Minn. Stat. § 524.5-313(c)(4)(i). But this power is limited and certain extreme forms of medical care— namely "psychosurgery, electroshock, sterilization, or experimental treatment of any kind"—cannot be authorized by the guardian "unless the procedure is first approved by order of the court." *Id.*

The majority concludes that the termination of life support without a court order falls within the guardian's ability to provide consent for necessary medical care. I do not believe that end-of-life decisions, including the termination of life support, fall within the statutory framework as neatly as the majority suggests. The statute discusses the guardian's "power to give any necessary consent *to enable the ward to receive* necessary medical or other professional care." Minn. Stat. § 524.5-313(c)(4)(i) (emphasis added). The most natural reading of this language envisions the guardian consenting to the *provision of* medical care to the ward, not terminating all care. Although I agree that the power of consent must also include the power to refuse consent, a decision to not pursue a particular course of action is different than terminating care that is currently in progress, especially when terminating care will cause the ward's death. To state it more bluntly, the plain language of the statute does not authorize the guardian to take action that directly leads to the death of the ward.

D-2

Thus, I disagree with the majority's conclusion that the plain language of the statute unambiguously authorizes guardians to terminate life-sustaining care. The plain language of the statute, stated in the positive and focused on enabling the ward to receive necessary care, is not well suited to addressing the circumstances before us here—circumstances in which the medical care is necessary to sustain the ward's life, but the guardian wishes to terminate care. The statute makes no mention of withdrawing consent or enabling the guardian to terminate medical care that is essential to the ward's survival. The silence of the statute as to a guardian's role in terminating necessary medical care could be read to permit termination or withdrawal of care, but it is equally reasonable to conclude that the statute does not authorize these actions by a guardian, and so I would conclude that the statute is ambiguous. *See Rohmiller v. Hart*, 811 N.W.2d 585, 590 (Minn. 2012) (recognizing that when silence renders the statute susceptible to more than one reasonable interpretation, the statute is ambiguous); *In re Alexandria Lake Area Sanitary Dist. NPDES/SDS Permit No. MN0040738*, 763 N.W.2d 303, 311 (Minn. 2009) ("When a statute or regulation is silent on a precise issue, that silence may be evidence of ambiguity.").

B.

The canons of statutory construction, which operate once we conclude a statute is ambiguous, also do not support the majority's conclusion that guardians have the authority to terminate the life support of a ward without a court order. If a statute is ambiguous, it is necessary to determine the intent of the Legislature. *Brayton v. Pawlenty*, 781 N.W.2d 357, 363 (Minn. 2010). In searching for legislative intent, we

apply our canons of construction and consider "a number of matters, including the legislative history, the necessity for the law, and the consequences of various interpretations." *Burkstrand v. Burkstrand*, 632 N.W.2d 206, 210 (Minn. 2001); *see also* Minn. Stat. § 645.16 (2012). In looking at the consequences of the competing interpretations, we presume that the Legislature did not intend an absurd result. Minn. Stat. § 645.17(1) (2012) (stating that when ascertaining the intention of the Legislature, courts may presume that "the legislature does not intend a result that is absurd, impossible of execution, or unreasonable"). We have also said that an ambiguous statute should not be read literally if that interpretation would undermine the policy of the statute as a whole. *See Lowry v. City of Mankato*, 231 Minn. 108, 113-14, 42 N.W.2d 553, 557-58 (1950).

Vogel argues, and the court of appeals agreed, that because the termination of life support is not listed specifically in Minn. Stat. § 524.5-313(c)(4)(i) as a decision that requires court approval, a guardian does not need court authorization for this type of action. But this interpretation gives too much weight to the concept of *expressio unius est exclusio alterius*, which loosely translates as "the expression of one thing is the exclusion of another." *State v. Caldwell*, 803 N.W.2d 373, 383 (Minn. 2011). In essence, the *expressio unius* canon presumes that when the Legislature has enumerated a list of items, a court should assume that this list is meant to be exclusive, and therefore any item that does not appear on the list should be viewed as being intentionally omitted. *Id.* ("*Expressio unius* generally reflects an inference that any omissions in a statute are intentional."). Thus, because the Legislature listed "psychosurgery, electroshock,

sterilization, or experimental treatment of any kind" in Minn. Stat. § 524.5-313(c)(4)(i) as treatments requiring court authorization, Vogel argues that we should assume that the Legislature did not intend for there to be an authorization requirement for the termination of life support.

But this interpretation requires us to assume, despite a lack of evidence in the legislative history of this statute, that the process for a guardian to order the termination of a ward's life support was an issue that the Legislature actually considered. In cases in which the legislative history is noticeably silent as to any discussion of the issue, it is improper to employ the *expressio unius* canon because there is no basis for believing that the missing item was considered, or even foreseen, by the Legislature. *Caldwell*, 803 N.W.2d at 383 (explaining that the *expressio unius* canon is only justified when the language of the statute supports an inference that the omission was intentional). As the United States Supreme Court has explained, "We do not read the enumeration of one case to exclude another unless it is fair to suppose that [the legislative branch] considered the unnamed possibility and meant to say no to it." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003). And in this case, it is unfair to make such an assumption. The guardianship statutes and legislative history give no indication that the Legislature considered whether a guardian could terminate life support at all, much less whether it required court approval, and so it is improper to read the list of items requiring court authorization in Minn. Stat. § 524.5-313(c)(4)(i) as the Legislature's way of saying that court authorization is not required for termination of life support.

Given the lack of evidence that the Legislature intended to speak on the necessity of court approval when a guardian seeks to terminate a ward's life support, we look beyond the language of the specific statute to the rest of the statutory scheme and review how the termination of life support fits into the general scheme that the Legislature has created for the interactions between the courts and guardians. *Erdman v. Life Time Fitness, Inc.*, 788 N.W.2d 50, 56 (Minn. 2010) (noting that we must "read and construe a statute as a whole and must interpret each section in light of the surrounding sections to avoid conflicting interpretations"). On this point, I believe the answer is clear: the Legislature intended for guardians to seek court approval before taking extreme measures. Minnesota Statutes § 524.5-313(a) provides that "[a] guardian shall be subject to the control and direction of the court at all times and in all things." The termination of life support is the most difficult decision that a guardian can be asked to make. It involves not only the analysis of medical evidence, but also consideration of the ward's beliefs and wishes, which in some cases, including this one, may not be clear to the guardian even though they may implicate some of the ward's most fundamental and deeply held beliefs. In short, the decision to terminate life support is a more complicated decision with more severe and permanent consequences than any of the circumstances listed by the Legislature in Minn. Stat. § 524.5-313(c)(4)(i) as requiring court approval.

It is clear that the Legislature intended to ensure the well-being of wards by providing for court review and supervision of the more difficult and challenging decisions made by a guardian. When a guardian is faced with the decision to terminate life support, the potential harm that could be caused by a guardian's abuse of discretion is

far greater than the decision to consent to "experimental treatment" listed in Minn. Stat. § 524.5-313(c)(4)(i), which in some instances may not even involve particularly controversial decisions. An interpretation that a guardian's actions require court approval for the latter but not for the former ignores the very reason for which the statute exists. But whether viewed as undermining the policy of the statutory scheme as a whole, or as an absurd result not intended by the Legislature, empowering the guardian to make these life-or-death decisions under these circumstances is not consistent with legislative intent. Therefore, the statutory language simply does not support the expansive powers for guardians that the majority grants.

I conclude that the guardian actions requiring court involvement set out in Minn. Stat. § 524.5-313(c)(4)(i) is not an exclusive list, and that the removal of life support given the facts presented here also requires court authorization.[1]

II.

I turn next to the specific facts of this case and the troubling implications of the majority opinion.

---

[1] This interpretation is also supported by our decision in *In re Conservatorship of Torres*, 357 N.W.2d 332, 339-40 (Minn. 1984) (concluding that Minnesota courts have the power to authorize a guardian to order the removal of a ward's life support system). In *Torres*, we characterized the statute that preceded Minn. Stat. § 524.5-313(c)(4)(i) as "requir[ing] the [guardian] to have court approval before consenting to more controversial medical procedures on behalf of the [ward]." *Torres*, 357 N.W.2d at 337. Thus, in *Torres* we rightly discussed the statute not in terms of the specific examples of controversial medical procedures that are enumerated, but instead recognized that the enumerated procedures are representative of the *type* of decision that guardians should seek court-approval for—that is, "controversial medical procedures." *Id.*

It is to the everlasting credit of Allina here that management recognized the uncertainty in the law and the need to seek court approval for the withdrawal of medical care. The evidence mustered to support the claim that Tschumy would have wanted life support terminated is extremely weak,[2] which shows the necessity of court involvement before such action is taken. More importantly, the effect of the rule announced today is to give guardians of the most isolated and vulnerable wards unchecked power to make life-or-death decisions, while simultaneously decreasing the likelihood that any judicial review of this decision will ever occur.

We deal here not with the more typical end-of-life treatment circumstances in which competent adults have expressed their wishes, or better yet, have prepared health care directives, or in which family or even close friends may well know the wishes of the patient. Rather, for many of our fellow citizens who are cognitively impaired, it is a different story. It is not unusual for the disabled to have the assistance of court-appointed guardians. Perhaps those guardians have some training or knowledge on making end-of-life decisions, and perhaps not. Perhaps those guardians have the best interests of the ward in mind, and perhaps not. Perhaps the ward has expressed a view on medical care,

---

[2] Although various assurances were offered that Tschumy would not want continued medical care under these circumstances, these statements were all conclusory and not based on any expressed intent by Tschumy. In fact, as Vogel observed, Tschumy did not trust doctors and specifically refused to discuss the issue. The closest Vogel comes to submitting evidence of Tschumy's actual wishes was his observation that "Mr. Tschumy wanted to be outside much of the time," which leads Vogel to conclude that Tschumy "would not want to spend his remaining days inside, confined to a hospital bed." To say that the fact that Tschumy enjoyed the outdoors is underwhelming evidence of Tschumy's desire to have his life support terminated is an understatement of the first order.

and perhaps not. But once the decision is made by the guardian to withdraw medical care, for good or ill, whether for sound motives or base motives, whether that decision is well informed from a medical perspective or otherwise, it will be made in silence and with no check or review of the guardian's judgment

The majority opinion recognizes none of these complications and simply empowers guardians to act. I acknowledge that the subset of cases subject to the rule announced today is likely small, but the consequences are great and the better course is to rely on judicial supervision and approval for the withdrawal of medical care unless and until the legislature provides a better framework for dealing with these decisions.

Therefore, because I believe that the best interpretation of Minn. Stat. § 524.5-313(c)(4)(i) requires guardians, in circumstances such as those found here, to obtain court authorization before terminating a ward's life support, I respectfully dissent.

STRAS, Justice (dissenting).

If the caption of this case accurately reflected the nature of this appeal, it would say *In re the Interpretation of Minn. Stat. § 524.5-313(c)(4)(i)*, rather than *In re the Guardianship of: Jeffers J. Tschumy, Ward*.

The reason is that this appeal has little to do with Jeffers Tschumy. When Tschumy was alive, Abbott Northwestern Hospital sought and obtained a court order to cease providing life-sustaining medical treatment to Tschumy, who died shortly thereafter. At that point, there was nothing left for the district court, or any other court, to decide in order to resolve the parties' dispute. It is now more than two years after the cessation of treatment and Tschumy's death, and the parties to the original dispute have received exactly the relief that they requested. Yet the parties in this appeal still seek an answer to the question of whether a court order was required to remove life support, a controversial and difficult legal question that is purely academic at this point.

The parties' request strikes at the very heart of judicial power. For nearly 150 years, we have consistently declined to answer purely academic questions, no matter how interesting or important they are, because courts do "not issue advisory opinions or decide cases merely to make precedent[]." *Sinn v. City of St. Cloud*, 295 Minn. 532, 533, 203 N.W.2d 365, 366 (1972). Yet despite our longstanding prohibition on advisory opinions, the plurality is ready and willing to answer the parties' question because, in its view, the case is functionally justiciable and the legal issue is sufficiently important. I respectfully dissent because the plurality's approach casts aside the fundamental

limitations on our authority and aggrandizes judicial power at the expense of the Legislature—the branch of government that the Minnesota Constitution vests with the authority to address abstract policy questions. Minn. Const. arts. III, § 1, IV, § 1.

I.

Jeffers Tschumy became a ward of the state in June 2005, when the district court appointed a conservator for him. A little more than two years later, the guardianship case underlying this appeal began when a social worker petitioned the district court to appoint Tschumy's conservator as his guardian. At the time, Tschumy was 52 years old and suffered from paranoid schizophrenia, anxiety, and a depressive disorder. The district court granted the guardianship petition in April 2008.

The district court later dismissed the original guardian for cause and appointed a professional guardian, Joseph Vogel, to act on Tschumy's behalf. When the court appointed Vogel, it granted him the power to "[g]ive any necessary consent to enable, or to withhold consent for, [Tschumy] to receive necessary medical or other professional care, counsel, treatment or service."

In April 2012, Tschumy suffered serious injuries when he choked on food. Tschumy was admitted to Abbott Northwestern Hospital (the "Hospital"), and the medical staff placed him on life support. Medical tests determined that Tschumy had suffered a serious brain injury from lack of oxygen. One week later, the medical staff advised Vogel that any further medical intervention on Tschumy's behalf would be futile, and possibly even harmful to him, and that all life-sustaining medical treatment should cease. Vogel agreed and directed the hospital to withdraw life support.

D-2

The Hospital did not follow Vogel's direction. Instead, it asked the district court to grant the power to Vogel "to specifically authorize the . . . removal of life support systems." The next day, the district court held a hearing on the motion. At the hearing, the Hospital explained that it was unsure whether the existing guardianship letter permitted Vogel to unilaterally direct the removal of life support, so it sought either "clarification" of the existing letter or an amendment that would grant such authority to Vogel. Vogel opposed the Hospital's motion because he believed that he already had such authority and that it "would set an awful precedent" if a hospital had to "run to court to get an order for clarification" each time a guardian requested the withdrawal of life support from a ward. Nevertheless, Vogel emphasized to the court that "[t]here [was] no disagreement anywhere" and "really no controversy" over whether to withdraw life support.

The district court expressed concern that Tschumy's "voice [wasn't] being heard, except as expressed by Mr. Vogel, based on an appointment from a few years ago." The court therefore appointed Michael Biglow as Tschumy's attorney "to do some foot work to get a sense of Mr. Tschumy's situation[,] what his desire would be[,] and what the medical situation would be."

Soon thereafter, Biglow filed a report with the court. Tschumy was completely nonresponsive following the choking incident, so in drafting his report, Biglow relied on Tschumy's medical records and information that he had gathered from others, including Vogel, who purported to have knowledge of Tschumy's preferences. In the report, Biglow did not take a position on the legal issue of whether Vogel had the authority to

unilaterally direct the hospital to withdraw life support. Instead, Biglow "advocate[d] on [Tschumy's] behalf that moving from active treatment to comfort care would be in [his] best interests."

The district court then held another hearing. The hearing addressed two questions: (1) whether to withdraw life support; and (2) whether Vogel had the legal authority to direct the Hospital to remove life support. As to the first question, both Biglow and Vogel testified. Following their testimony, the Hospital's attorney stated that "there doesn't seem to be any dispute" among the parties that "[t]he best course of treatment would be to withdraw care."

As to the second question, the court heard testimony from Stephen Grisham, a professional guardian whom Vogel offered as an expert witness. Grisham did not address Tschumy's case specifically, but instead testified generally about the role of guardians in making end-of-life decisions. He discussed the training that he and other professional guardians receive, and gave his opinion on "what would happen [if] the Court were to issue an order that basically said that [guardians] had to come to court for a review on every one of these termination of life support cases." He said that it would "change the landscape dramatically."

After Grisham's testimony, Vogel's attorney reiterated his belief that Vogel "already has the authority" to direct the withdrawal of life support. At the court's invitation, Biglow provided his own opinion and took the opposite view. The attorney for the Hospital then pointed out that the broader legal question regarding the authority of guardians to direct the removal of life support "is [not] necessarily something that needs

D-4

to be decided in this case," and that the court could instead limit its decision to whether the Hospital could withdraw life support from Tschumy in this particular case. The court responded that the question regarding the scope of a guardian's authority in end-of-life decisions "obviously creates a lot of complications and no[n-]uniformity across the state," such that "there may be some value in getting some uniformity" on the question.

The district court issued two orders after the hearing. In the first, the court described the case as involving "two questions of ultimate significance for Jeffers Tschumy: First, should Mr. Tschumy be taken off life support and allowed to die? Second, who has the power to decide whether Mr. Tschumy will live or die: the Court or the guardian?" With respect to the first question, the court authorized the Hospital to withdraw life support. The court promised to address the second question in a later order, saying:

> The issue of who has the power to order the removal of life support—the Court or the guardian—is of great significance to thousands of wards, guardians, and family members throughout Minnesota. It is also one subject to a variety of perspectives, practices, and practicalities. If there could be only one thing in our judicial system that is consistent, fair and practical, it should be the process by which our justice system allows death to come to its citizens. The issue is of statewide significance; it is subject to a range of practices and policies; it does not lend itself to easy appellate review; it has escaped the attention of our legislature; and it relates to the fundamental beliefs of life and death. The Court would not serve the people of Minnesota well if it danced around the issue and left the power and process of death as uncertain as it is now. Accordingly, the Court will address that issue, but by separate order so as to allow Mr. Tschumy to be removed from life support.

The order granted the precise relief that the Hospital had sought in its motion—namely, court authorization to remove Tschumy from life support—and no one appealed from the order.

Tschumy died on May 10, 2012, one day after the court authorized the removal of life support, and seventeen days after the Hospital had sought relief in the district court. Under Minn. Stat. § 524.5-317 (2012), "[a] guardianship terminates upon the death of the ward or upon order of the court," so Vogel's appointment as Tschumy's guardian terminated by operation of law on the date of Tschumy's death. Vogel nevertheless petitioned for discharge as Tschumy's guardian, and one week later, the district court granted the petition. Thus, Vogel sought and received his discharge as Tschumy's guardian.

The district court issued its second order approximately five months later, in October 2012. As framed by the district court, the question before it was whether, as a general matter, a guardian or a court must decide whether to remove a ward from life support. The district court noted that, in *In re Conservatorship of Torres*, 357 N.W.2d 332 (Minn. 1984), this court had concluded that a probate court could authorize a conservator to order the removal of life support from a ward but did not address whether a guardian could do so without court approval. The district court said that, "[b]ecause neither the *Torres* court nor the Legislature have addressed whether a guardian has the power to authorize the removal of life support, this Court is left to pick up where the *Torres* court left off." The district court concluded that, "under *Torres* and the current

D-6

statutory scheme, courts must make end-of-life decisions when a guardian has been appointed."

Although the court labeled its opinion an "order," the opinion did not actually order anyone to do anything, nor did it decide a disputed legal question of significance to Tschumy or to his estate. In fact, other than briefly reciting the facts of Tschumy's case, the order did not say anything at all about Tschumy. The order concluded with the following statement:

> Minn. Stat. § 524.5-313 grants broad power to guardians to consent to necessary medical treatment on behalf of their wards, but it does not specifically convey the power to terminate life support. Hopefully, the Legislature or higher judicial authority will definitively determine who can make end-of-life decisions, and how those decisions must be made. Until that time, this Court concludes that guardians under the Court's jurisdiction must ask the court for authorization to terminate life support when there is not a valid health care directive addressing end-of-life circumstances.

A few days later, the district court ordered Vogel to "remain on the case pending . . . appeal." And despite his earlier discharge as Tschumy's guardian, Vogel filed a notice of appeal from the district court's October order. Recognizing the complications created by the odd procedural posture of the case, the court of appeals directed the parties to "file informal memoranda on the questions of whether the order filed on October 18, 2012, is independently appealable, whether appellant has standing to appeal, and whether the appeal is moot." The court of appeals ultimately concluded that the October order was appealable, Vogel had standing to appeal, and the appeal was not moot. As to the merits, the court of appeals concluded that a guardian who has been granted medical-consent authority under Minn. Stat. § 524.5-313(c)(4)(i) may, "absent

objection by an interested person and with advice from available family members, physicians, and an ethics committee, . . . direct the disconnection of life-support systems without further authorization from the district court." *In re Guardianship of Tschumy*, 834 N.W.2d 764, 775 (Minn. App. 2013).

Biglow, ostensibly acting on Tschumy's behalf, petitioned this court for review of the court of appeals' decision. We granted Biglow's petition, but it is still unclear why Biglow sought review. He has never once spoken with Tschumy and was appointed solely to report on Tschumy's desires and medical situation in order to help the district court decide whether to grant the Hospital's motion to remove life support. At oral argument, the parties notified the court that Tschumy's estate has paid for all of the legal fees incurred by both sides. While Biglow's motivation for the appeal is unclear, Vogel seeks a definitive answer to the question of whether approval from the district court is required to withdraw life-sustaining medical treatment for a ward because, as a professional guardian, he may be placed in the same situation again and he seeks guidance on how to proceed.

II.

It is still unclear why, or how, this case is before us, and on whose behalf the two parties are acting. For its part, the plurality asserts that the legal issue in this case is important and the case is functionally justiciable, so we should just go ahead and decide it. The problem is that this case has *all* of the hallmarks of a nonjusticiable controversy. The parties appealed from an advisory opinion of the district court, the same pot of money is paying for the legal fees incurred by both parties, and there is no way to order

D-8

meaningful relief for anyone in this litigation regardless of the legal conclusion that we reach. Under these circumstances, in which there is no case or controversy, it is our duty under the Minnesota Constitution to dismiss the appeal.

## A.

The Minnesota Constitution does not grant us the authority to "decide cases merely to make precedents." *Doyle v. Ries*, 205 Minn. 82, 84, 285 N.W. 480, 481 (1939); *accord, e.g.*, *In re Schmidt*, 443 N.W.2d 824, 826 (Minn. 1989); *Sinn*, 295 Minn. at 533, 203 N.W.2d at 366. Rather, "[w]e make precedents only as incident to the determination of actual controversies." *Works v. Tiber*, 169 Minn. 172, 173, 210 N.W. 877, 878 (1926). As we recognized in 1865, only 8 years after Minnesota became a state, requiring judges to decide legal questions in the absence of an actual controversy is "inconsistent with judicial duties" and would set "a dangerous precedent." *In re Application of the Senate*, 10 Minn. 78, 81 (Gil. 56, 58) (1865).

We are not a junior-varsity legislature. The parties ask us to decide a legal question that is completely disconnected from any case or controversy and to make a pure policy decision about how guardians *should* act in the future when making life-ending decisions for a ward.[1] Instead of reiterating the longstanding principle that we do not

---

[1] There is no question, as the plurality states, that the judiciary's job includes interpreting statutes. However, we do not engage in statutory interpretation for its own sake. Rather, we interpret statutes only in the context of a justiciable controversy in order to provide meaningful relief to one or more of the parties. When we do so for any other reason, we cross the boundary from performing a judicial duty—that is, resolving disputes—into the realm of performing a legislative duty—that is, resolving policy questions in the abstract. Such an observation is hardly novel. The Supreme Court of the

(Footnote continued on next page.)

decide cases merely to make precedent and recognizing that pure policy decisions are for the Legislature to make, the plurality would adopt what is, in essence, a different rule: we do not decide cases merely to make precedent, unless we say differently. However, the plurality's rule would itself set a "dangerous precedent" and "[t]he evils which might result to the people from such a source will suggest themselves on a moment's reflection." *Id.*

To be sure, this case has its roots in what was once a justiciable controversy. Vogel, acting on Tschumy's behalf, directed the Hospital to cease giving life-sustaining medical treatment to Tschumy, but the Hospital refused to do so without a court order. The Hospital, in refusing to follow Vogel's instructions, was necessarily adverse to Tschumy, and by extension, Vogel, who represented Tschumy's interests. Thus, the controversy between *Tschumy and the Hospital*—neither of which has any interest in the proceedings before this court—was justiciable at its inception. *See Onvoy, Inc. v. ALLETE, Inc.*, 736 N.W.2d 611, 617-18 (Minn. 2007) (setting forth the requirements of a justiciable controversy).

---

(Footnote continued from previous page.)
United States has observed that ruling in the absence of a justiciable controversy "create[s] the potential for abuse of the judicial process, distort[s] the role of the Judiciary in its relationship to the Executive and the Legislature and open[s] the Judiciary to an arguable charge of providing government by injunction." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 222 (1974) (internal quotation marks omitted); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009) (stating that "courts have no charter to review and revise legislative and executive action" in the absence of a justiciable controversy).

When the district court authorized Tschumy's removal from life support in May 2012, however, the controversy ended and there was nothing left to decide. The Hospital, which had commenced the litigation, received the court authorization that it sought and advised the district court that it did not seek any other relief. In fact, the Hospital's attorney told the district court that "the decision about Mr. Tschumy can be made without [addressing the broader legal question] at all, and may[]be [it] should be." Tschumy also received the relief that he, as represented by Vogel (his guardian) and Biglow (his court-appointed attorney), had sought: authorization for the cessation of life-sustaining treatment. Yet, nearly 5 months later, the district court issued a second order, in which it broadly concluded that guardians do not have the authority to unilaterally withdraw life-sustaining medical treatment from a ward under the guardianship statutes, even though by the time of the second order, the case had long been moot.

The only person left unsatisfied by the district court's decision was Vogel. In his capacity as Tschumy's guardian, Vogel received exactly the relief he sought, and he has never contended otherwise. However, in his *personal* capacity as a professional guardian—entirely separate from his role in this particular case—Vogel would have preferred to win in a different way. Instead of obtaining court approval to withdraw treatment, Vogel wanted a court order saying that he already had the authority to direct the withdrawal of life support. Vogel made his opinion clear when he said that, if the district court decided to say (as it eventually did) that court approval was required to terminate treatment, such a ruling would be "an awful precedent."

Vogel's position, which the plurality must necessarily view as sufficient to create a justiciable controversy, suffers from several problems. First, Vogel's standing in this litigation has always been derivative of Tschumy's interests, and he has thus lacked standing throughout the appellate process, both because neither Tschumy nor his estate has any further interest in the case, and because Vogel is no longer serving as Tschumy's guardian. *See infra* Part II.C. To my knowledge, we have never held that a person who had a purely representational interest in the district court can assert a personal interest on appeal. There is, after all, a reason why the caption of this case says *In re the Guardianship of: Jeffers J. Tschumy, Ward*, rather than *In re the Personal Interests of: Joseph Vogel, Professional Guardian*. *See* Minn. Stat. § 524.5-106 (2012) (stating that the purpose of guardianship proceedings is to adjudicate rights relating to the ward).

Second, even if Vogel could now assert a purely personal interest on appeal, "[y]ou cannot persist in suing after you've won." *Greisz v. Household Bank (Ill.), N.A.*, 176 F.3d 1012, 1015 (7th Cir. 1999). Once a litigant has obtained the relief that he or she requested below, the fact that the litigant wishes the court had said something different in its opinion does not provide a sufficient continuing interest for an appeal. *See In re Custody of D.T.R.*, 796 N.W.2d 509, 513 (Minn. 2011) (explaining that "a party must be aggrieved in order to appeal" and that a party is not aggrieved unless "that person's rights were injuriously affected by the adjudication" (citation omitted) (internal quotation marks omitted)); *see also, e.g.*, *Ill. Bell Tel. Co. v. Ill. Commerce Comm'n*, 111 N.E.2d 329, 334 (Ill. 1953) ("It is fundamental that the forum of courts of appeal should not be afforded to successful parties who may not agree with the reasons . . . below."). In other words,

justiciability focuses on "whether the relief sought would, if granted, make a difference to the legal interests of the parties (as distinct from their psyches, which might remain deeply engaged with the merits of the litigation)." *Air Line Pilots Ass'n Intern. v. UAL Corp.*, 897 F.2d 1394, 1396 (7th Cir. 1990) (citing *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)).

Third, the personal interest asserted by Vogel on appeal—that the district court adopted the wrong legal rule—is clearly insufficient in light of the fact that district court orders have no precedential value and govern *only* the rights of the parties to the litigation. *See Green v. BMW of N. Am., LLC*, 826 N.W.2d 530, 537 n. 5 (Minn. 2013) ("That the district court orders lack precedential value . . . informs the weight we will give them."); *Kmart Corp. v. Cnty. of Stearns*, 710 N.W.2d 761, 769-70 (Minn. 2006); *see also* Minn. Stat. § 480A.08, subd. 3(c) (2012). It is difficult to understand how Vogel could retain a sufficient continuing interest, even in his personal capacity, in seeking the reversal of a legal rule adopted in a nonprecedential opinion that, by definition, applied only to Tschumy and the Hospital. *See D.T.R.*, 796 N.W.2d at 512 (stating that an individual's interest in litigation must be " 'actual or imminent, not conjectural or hypothetical' " (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992))); *State by Humphrey v. Philip Morris, Inc.*, 551 N.W.2d 490, 495 (Minn. 1996) (stating that a litigant must have a direct interest in the litigation rather than asserting just an abstract concern). Such an interest is at best hypothetical, and most likely fictional.

Fourth, it is questionable whether there are any adverse parties in this case at all. Vogel, ostensibly acting as Tschumy's guardian, is depleting the funds in Tschumy's

estate in an effort to obtain a non-"awful precedent" from this court. But Tschumy's estate is also paying the legal fees incurred by the other side—represented by Biglow, the court-appointed attorney who ostensibly represents Tschumy in this appeal—to advocate against Vogel's position. Tschumy's estate cannot simultaneously have an interest in two totally opposite rules: on the one hand, a rule that a court order is not required to remove life support (advanced by Vogel), and on the other, a rule that a court order is required to remove life support (advanced by Biglow). *Cf.* Minn. Stat. § 524.5-502(b)-(c) (2012) (authorizing compensation when an attorney "render[s] necessary services with regard to . . . the administration of the protected person's estate" or a guardian "render[s] necessary services . . . for the benefit of the ward"). In short, there is good reason to doubt that the parties are truly adverse when the same pot of money is funding the litigation expenses of both sides. *See United States v. Johnson*, 319 U.S. 302, 305 (1943) (concluding there was a lack of adversity when, among other things, the legal fees of both the plaintiff and the defendant were paid for by the same party); *Chicago & Grand Trunk Ry. Co. v. Wellman*, 143 U.S. 339, 344-46 (1892) (rejecting "a friendly suit" between two parties because it lacked adversity).

What is clear, therefore, is that Vogel and Biglow seek an advisory opinion—that is, they do not truly wish to resolve a current dispute, but instead seek our advice, as they sought the advice of the court of appeals, on an abstract legal question. We have said that a justiciable controversy exists "if the claim (1) involves definite and concrete assertions of right that emanate from a legal source, (2) involves a genuine conflict in tangible interests between parties with adverse interests, and (3) is capable of specific resolution

D-14

by judgment rather than presenting hypothetical facts that would form an advisory opinion." *Onvoy*, 736 N.W.2d at 617-18; *see also Schowalter v. State*, 822 N.W.2d 292, 299 (Minn. 2012) (applying the three requirements from *Onvoy* in determining that one of the issues in the case was not justiciable). This case does not satisfy *any* of the three requirements. *Cf. Schowalter*, 822 N.W.2d at 299 (refusing to address a legal question because *one* of three requirements of a justiciable controversy was unsatisfied).

First, no one is asserting a legally cognizable interest on appeal. Vogel's only interest in the appeal is his dissatisfaction with what he perceives to be an "awful" rule from a nonprecedential district court opinion. Biglow, for his part, does not articulate any continuing interest in this "dispute," let alone a legally cognizable one. Even aside from the fact that Tschumy, whom Biglow ostensibly represents, no longer has any interest in this case, Biglow is not a professional guardian, and he has never asserted that the outcome of this case will have any impact on his legal practice. In fact, at oral argument, Biglow all but acknowledged that the driving force for his legal position on appeal has been taking a position opposite to Vogel, rather than a personal or professional interest in obtaining a particular result. Second, there is insufficient adversity in this case because Tschumy's estate is paying the legal fees of both sides, and it is not clear why, or to what extent, either side is opposing the other. Third, as stated above, our judgment in this case (as well as that of the court of appeals) is meaningless, other than as an attempt to create precedent. Thus, even though this case presents a legal issue with statewide importance, the Minnesota Constitution requires us to exercise restraint and await a different case—one with a justiciable controversy—to decide the issue. *See St. Paul City*

D-15

*Ry. Co. v. City of St. Paul*, 259 Minn. 129, 133, 106 N.W.2d 452, 455 (1960) ("[W]e cannot now attempt to render an opinion to cover conditions which may *reoccur* in the future. Rather, it seems to us that those conditions will have to be faced when the occasions arise. . . . For us to attempt to pass at this time on [the issue] would be out of place." (emphasis added)); *see also State v. M.D.T.*, 831 N.W.2d 276, 285 (Minn. 2012) (Stras, J., concurring) ("[T]he 'judicial power' extends only to the resolution of actual controversies and does not permit us to render advisory opinions, no matter how important the legal question.").

In fact, in a case involving a request for a declaratory judgment, we emphasized that it is "essential" for courts to confirm that there is a justiciable controversy before rendering a decision on the merits. *Seiz v. Citizens Pure Ice Co.*, 207 Minn. 277, 281, 290 N.W. 802, 804 (1940). In *Seiz*, the plaintiff sought a declaratory judgment against his employer that a law amending Minnesota's unemployment-insurance statutes was unconstitutional. *See id.* at 279-80, 290 N.W. at 803. Even though the Attorney General intervened on the State's behalf, we held that the case was nonjusticiable because the parties did not have "adverse interests," the case did not "admit of specific relief," and the plaintiff's interest was "merely contingent upon the happening of some event in the future." *Id.* at 282-84, 290 N.W. at 804-06. We explained our decision as follows:

> The controversy must be justiciable in the sense that it involves definite and concrete assertions of right and the contest thereof *touching the legal relations of parties having adverse interests* in the matter with respect to which the declaration is sought, and *must admit of specific relief* by a decree or judgment of a specific character as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. *Mere*

> *differences of opinion with respect to the rights of parties do not constitute such a controversy.*

*Id.* at 281, 290 N.W. at 804 (emphasis added). It is almost as if we wrote *Seiz* with the specific circumstances of this case in mind.

As in *Seiz*, the parties here—Vogel and Biglow—do not really have "adverse interests." *Id.* at 281, 290 N.W. at 804; *see also In re Riddlemoser*, 564 A.2d 812, 816-17 (Md. 1989) (dismissing an appeal involving the question of whether guardians have the power to order the cessation of life-sustaining medical treatment because the ward had died and there was insufficient adversity among the parties, which had included the guardian and counsel for the ward). Both claim to be representing Tschumy's interest, but neither Tschumy nor his estate has any interest in the legal question before the court, and indeed, no one really has the slightest clue what Tschumy might have thought about the abstract legal question of whether a guardian may unilaterally order the discontinuation of a ward's life-support systems.[2] Nor does the controversy "admit of specific relief by a decree or judgment of a specific character." *Seiz*, 207 Minn. at 281,

---

[2] The plurality is correct that guardianship cases do "not contemplate adversity in the same way as a typical contested case." *See, e.g.*, *In re Guardianship of Spangler*, 933 N.E.2d 1067, 1074 (Ohio 2010) ("Guardianship proceedings . . . are not adversarial but rather are in rem proceedings involving only the probate court and the ward."). Even so, parties who seek to appeal an order in a guardianship case still "must either have an interest adverse to the ward's or have otherwise been aggrieved in some manner by the order." *In re Guardianship of Santrucek*, 896 N.E.2d 683, 685 (Ohio 2008). What is missing in this case is the possibility that a court could order meaningful relief in favor of either the ward or the ward's estate. The parties in this case all but concede—as they must—that the outcome of this appeal will have no effect on Tschumy or his estate. Thus, even under the reasoning of the cases relied upon by the plurality, adversity remains critical to ensure that the reason for the litigation remains the interests of the ward and not the personal interests of the parties.

290 N.W. at 804. Neither the plurality nor the parties explain how our decision in this case could do anything except announce an abstract legal rule, which by itself cannot be "specific relief." Finally, this case squarely fits within *Seiz*'s warning that we should be wary of cases that turn on "[m]ere differences of opinion with respect to the rights of parties" because such cases do not "constitute . . . a controversy."[3] *Id.* at 281, 290 N.W. at 804. Based on *Seiz*, therefore, the court should dismiss this case "for want of jurisdiction of the subject matter . . . ." *Id.*

The requirement of a justiciable controversy is not an excuse for courts to decline to decide tough or important questions. Rather, it is a constitutional constraint on the authority of the judiciary. The Minnesota Constitution divides the powers of the government into three "distinct departments," and provides that "[n]o person or persons

---

[3]    The plurality concludes that this case is justiciable based on its view that a disagreement between the parties over the legal issues in this case is not only *necessary*, but is also *sufficient* to present a justiciable controversy. For example, in explaining why the district court's second order was not an advisory opinion, the plurality stresses that "the parties in this case were adverse at the district court, as they are here, with respect to the statutory interpretation question." The plurality makes the same point in distinguishing *Seiz*, but in doing so, fails to accord significance to the actual words we used in our opinion. As *Seiz* makes clear, a "mere difference[] of opinion with respect to the rights of the parties do[es] not constitute . . . a [justiciable] controversy." *Seiz*, 207 Minn. at 281, 290 N.W. at 804 (stating that a justiciable controversy "must admit of specific relief"); *see also North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (stating that the very definition of an advisory opinion is when the parties call on a court "to decide questions that cannot affect the rights of the litigants before them"). Accordingly, whenever we have had the opportunity to do so, we have roundly rejected the proposition that a disagreement about the proper resolution of a legal issue, standing alone, can present a justiciable controversy. *See, e.g.*, *St. Paul Area Chamber of Commerce v. Marzitelli*, 258 N.W.2d 585, 587-90 (Minn. 1977); *Markwardt v. State*, 254 N.W.2d 371, 374 (Minn. 1977); *Beatty v. Winona Hous. and Redev. Auth.*, 277 Minn. 76, 83-86, 151 N.W.2d 584, 588-89 (Minn. 1967); *Seiz*, 207 Minn. at 281, 290 N.W at 804.

belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others except in the instances expressly provided in this constitution." Minn. Const. Art. III, § 1. The judiciary is limited to "judicial act[s]." *Application of the Senate*, 10 Minn. at 81 (Gil. at 58). The resolution of an abstract legal question outside of the context of a justiciable controversy is not a "judicial act," it is a legislative act, and I cannot subscribe to the plurality's approach because it requires us to act as legislators, not as judges.

The district court recognized the policy-making nature of its actions when it decided this case. In its May 2012 order, the district court said that "[t]he issue of who has the power to order the removal of life support—the Court or the guardian" is one that "has escaped the attention of our [L]egislature." In its October 2012 order, the court expressed the hope that "the Legislature or higher judicial authority will definitively determine who can make end-of-life decisions, and how those decisions must be made." The court pointed out that the legal question was "of great significance to thousands of wards, guardians, and family members throughout Minnesota" and said that "[t]he Court would not serve the people of Minnesota well if it danced around the issue and left the power and process of death as uncertain as it is now."

Consistent with its self-appointed task of filling in the gaps left by the Legislature, the district court took testimony from a professional guardian, Stephen Grisham, about the training of guardians with respect to end-of-life care and about whether guardians can be trusted in a typical case—not in this specific case—to make end-of-life decisions for their wards. Such testimony would be entirely appropriate at a legislative hearing about

D-19

the guardianship statutes, but it is out of place at a judicial hearing on whether to authorize the withdrawal of life support from a single ward—especially when all parties agreed that the removal of life support was appropriate. Just five months later, the district court issued an order, itself an advisory opinion, in which it concluded that "[t]he lack of training and consistency among most guardians is precisely the reason to involve the judicial system—to provide experienced and impartial examination and evaluation of termination decisions." The court's conclusion is precisely the type of pure policy decision we generally leave to the Legislature. *See Axelberg v. Comm'r of Pub. Safety*, 848 N.W.2d 206, 213 (Minn. 2014) ("In short, if the Implied Consent Law needs revision in order to make it embody a more sound public policy, the Legislature, not the judiciary, must be the reviser.").

It should be clear at this point, as the district court's language in its second order implicitly acknowledged, that this case no longer involves any real controversy between the parties. It is now a manufactured controversy involving an abstract and hypothetical legal question that the parties, if the question is still sufficiently important to them, should direct to the Legislature. Accordingly, rather than adopting an approach that would expand our own power at the Legislature's expense, I would instead follow precedent and dismiss the appeal in this case for lack of subject matter jurisdiction.

B.

Not only does this case fail to satisfy our general definition of a justiciable controversy, which alone warrants dismissal,[4] it is also moot. A case becomes moot when "the court is unable to grant effectual relief." *In re Schmidt*, 443 N.W.2d 824, 826 (Minn. 1989). Mootness has been described " 'as the doctrine of standing set in a time frame: the requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).' " *Kahn v. Griffin*, 701 N.W.2d 815, 821 (Minn. 2005) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).

---

[4] The term "justiciable" refers to a case or controversy that is "capable of being disposed of judicially" or one that is "properly brought before a court of justice." *Black's Law Dictionary* 997 (10th ed. 2014). The central concept of "justiciability" is then divided into "more specific categories of justiciability—advisory opinions, feigned and collusive cases, standing, ripeness, mootness, political questions, and administrative questions." 13 Charles Alan Wright et al., *Federal Practice and Procedure* § 3529, at 612 (3d ed. 2008) (citing cases); *see also McCarney v. Ford Motor Co.*, 657 F.2d 230, 233 (8th Cir. 1981) (describing "standing as a part of the concept of justiciability which includes the questions of advisory opinions, mootness and ripeness").

When we announced the three fundamental requirements for a justiciable controversy in *Onvoy*, we provided a general definition that *every* case must satisfy. For example, in *Schowalter*, we refused to decide one of the issues presented in the case because there was insufficient adversity between the parties, and we did not refer to any of the specific justiciability doctrines—such as mootness, ripeness, or standing—in reaching our conclusion. 822 N.W.2d at 299. Applying *Schowalter*'s analysis here, this case is nonjusticiable because it does not meet the definition of a justiciable controversy, regardless of whether it satisfies the requirements of one of the more specific justiciability doctrines such as mootness. By examining only the question of mootness, the plurality's analysis ignores an entire line of cases beginning with *Application of the Senate* and culminating with our most recent decision in *Schowalter*.

The plurality concludes, and I agree, that this case is moot because we are unable to grant effective relief to anyone, much less Tschumy. Nevertheless, the plurality would decide the case anyway because, in its view, it "presents an important public issue of statewide significance" and it is "functionally justiciable."

The plurality correctly observes that we have recognized certain exceptions to the mootness doctrine. It is also true that we have described mootness as "a flexible discretionary doctrine, not a mechanical rule that is invoked automatically whenever the underlying dispute between the particular parties is settled or otherwise resolved." *State v. Rud*, 359 N.W.2d 573, 576 (Minn. 1984). But in arguing that we should decide this particular case, the plurality stretches the mootness doctrine beyond mere flexibility, into the realm of infinite elasticity.

An animating principle underlying the various exceptions to the mootness doctrine is a recognition that a case may become moot at such an "advanced stage" that it may prove "more wasteful than frugal" to dismiss it. *Friends of the Earth*, 528 U.S. at 191-92; *see also State ex rel. Sviggum v. Hanson*, 732 N.W.2d 312, 322 (Minn. App. 2007) (discussing the exceptions to the mootness doctrine, including the capable-of-repetition-yet-evading-review exception). Thus, when the Supreme Court considers whether to recognize a new exception, it usually examines whether the new exception will promote judicial efficiency. *See Honig v. Doe*, 484 U.S. 305, 331 (1988) (Rehnquist, C.J., concurring) (noting that "while an unwillingness to decide moot cases may be connected to the case or controversy requirement of Art. III, it is an attenuated connection that may be overridden where there are strong reasons to override it"); *see also Friends of the*

*Earth*, 528 U.S. at 191-92 (discussing the voluntary-cessation exception to the mootness doctrine); *S. Pac. Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498, 514-17 (1911) (discussing the capable-of-repetition-yet-evading-review exception to the mootness doctrine). In *Honig*, for example, Chief Justice Rehnquist proposed a new exception to the mootness doctrine for cases that become moot after the Supreme Court has granted certiorari or noted probable jurisdiction. *See* 484 U.S. at 331-32 (Rehnquist, C.J., concurring).

This case did not become moot at such an "advanced stage" that a dismissal would prove "more wasteful than frugal." In fact, it became moot just 16 days after the Hospital filed its motion, when the district court granted the Hospital's motion to discontinue treatment. At that point, there was nothing else to decide. In contrast, in *none* of the cases cited by the plurality to support its view that the case is functionally justiciable did the case become moot *before* the district court entered final judgment. *See, e.g.*, *Jasper v. Comm'r of Pub. Safety*, 642 N.W.2d 435 (Minn. 2002) (deciding an appeal even though the Commissioner of Public Safety promulgated a new regulation *after* this court had granted review of the case); *Rud*, 359 N.W.2d at 576 (applying an exception to the mootness doctrine when the State dismissed the charges against the defendant *after* this court had granted review of the case); *see also State v. Matthews*, 779 N.W.2d 543, 548 (Minn. 2010) (reviewing a jury instruction on a crime of which the defendant was found guilty, even though the issue arguably became moot after the district court convicted him of another crime). In other words, the plurality does not cite a single case in which an

appellate court was required to write an advisory opinion in review of an advisory opinion.

The distinction is significant. The longer a case has been moot, the further divorced it becomes from the personal interests that animated the controversy in the first place, and the more it resembles a "mere difference[] of opinion," *Seiz*, 207 Minn. at 281, 290 N.W. at 804. Indeed, there is not much daylight between the plurality's conclusion in this case—that a controversy that has long been moot is justiciable—from a conclusion that a justiciable controversy is no longer necessary at all.[5]

It is true, as the plurality notes, that courts in other jurisdictions have decided controversies that are similar to this one. But these foreign cases were all decided under different constitutions—some of which permit advisory opinions in certain circumstances—and in the face of different facts—none of which required an appellate court to review what was itself an advisory opinion. Most importantly, these other courts have adopted an approach that is inconsistent with this court's interpretation of Article III, Section 1 of the Minnesota Constitution.

---

[5]     If the absence of a justiciable controversy does not preclude us from deciding this case—in which there was no live controversy when the district court issued the order now under review—it is hard to imagine a case that the plurality *would* dismiss. Perhaps the plurality would dismiss an abstract controversy based on nothing more than a straightforward philosophical disagreement between two parties, but given that this case has evolved into precisely such a disagreement between Vogel and Biglow, such a possibility provides little comfort. There is also little comfort in the fact that the exception invoked by the plurality requires the case to present a question of statewide importance. After all, virtually every case on our discretionary docket presents a question of statewide importance. *See* Minn. R. App. P. 117, subd. 2 (setting forth the criteria on which we should grant review, including whether "the question presented is an important one upon which the Supreme Court should rule").

C.

This appeal is nonjusticiable for yet a third reason: Vogel lacked standing to appeal the district court's second order. *See In re Custody of D.T.R.*, 796 N.W.2d 509, 512 (Minn. 2011) (noting that a party must "have standing before a court can exercise jurisdiction"). Tschumy died in May 2012, so by the time the district court issued its second order in October 2012, Vogel was no longer Tschumy's guardian. Minn. Stat. § 524.5-317 (2012) ("A guardianship terminates upon the death of the ward *or* upon order of the court." (emphasis added)). Vogel left no doubt about that fact when he successfully petitioned the district court for an order confirming his termination as guardian just days after Tschumy's death. Nevertheless, after the district court issued the order now under review, it ordered that Vogel "shall remain on the case pending . . . appeal," and based on that order, the court of appeals permitted Vogel—who no longer represented Tschumy in any way—to appeal the district court's order. However, by the time the district court issued its second order, Vogel no longer had standing to file an appeal because he was no longer a party to the litigation, a fact that the district court could not simply change by fiat.

Standing must exist at all stages of the litigation, "including when a plaintiff brings a cause of action and when a party appeals a decision." *D.T.R.*, 796 N.W.2d at 512. A party can establish standing in two ways: by demonstrating "either [that] the [party] has suffered some 'injury-in-fact' or [that] the [party] is the beneficiary of some legislative enactment granting standing." *Enright v. Lehmann*, 735 N.W.2d 326, 329 (Minn. 2007).

With respect to statutory standing, Vogel cannot identify any statute, nor am I aware of any, that grants a *former* guardian the right to appeal from the adjudication of a legal question related to a former ward. To be sure, a guardian—that is, a non-terminated guardian—has certain rights as an "interested person" in guardianship proceedings. *See* Minn. Stat. § 524.5-102, subd. 7(ii) (2012). But nothing in the guardianship statutes allows a guardian, former or otherwise, to appeal an order in the guardian's personal capacity or permits a former guardian to take any action on behalf of a ward. *See* Minn. Stat. § 524.5-414(a) (2012) (limiting the authority to "file a petition in the appointing court" to only "interested person[s]" and "protected person[s]," neither of which includes a former guardian); *see also* Minn. Stat. § 524.5-313(b) (2012) (stating that a guardian possesses "only those powers necessary to provide for the demonstrated needs of the ward").

The second basis for standing requires a party to have suffered an injury-in-fact—that is, "a concrete and particularized invasion of a legally protected interest." *D.T.R.*, 796 N.W.2d at 513 (citation omitted) (internal quotation marks omitted); *see also Enright*, 735 N.W.2d at 329 (defining an injury-in-fact). "That a party must be aggrieved in order to appeal remains fundamental . . . ." *D.T.R.*, 796 N.W.2d at 513 (citation omitted) (internal quotation marks omitted). For a party to have a right to an appeal, "[t]he injury to the right impacted by the adjudication must be immediate, and *not a 'possible, remote consequence, or mere possibility arising from some unknown or future contingency.'* " *Id.* (emphasis added) (quoting *In re Trust in Estate of Everett*, 263 Minn. 398, 401, 116 N.W.2d 601, 603 (1962)). Most importantly, unlike mootness, we have

never held that the requirement of standing can be set aside if the case is functionally justiciable and presents a question of statewide importance. *Cf. Friends of the Earth*, 528 U.S. at 191 (noting that "[s]tanding admits of no similar exception" when examining the capable-of-repetition-yet-evading-review exception to mootness).

Once the district court authorized the withdrawal of life-sustaining medical treatment in May 2012, Vogel received the only relief of interest to Tschumy. At that time, Tschumy no longer had a legally cognizable injury and it follows that, in his representational capacity, neither did Vogel. While it is *possible* that Vogel may one day sustain an injury in fact if he is unable to make a unilateral life-ending decision for some future ward to which he may be assigned, any such injury is, at most, only a " 'possible, remote consequence, or mere possibility arising from some unknown or future contingency.' " *See D.T.R.*, 796 N.W.2d at 513. That type of speculative injury, as we have long held, is insufficient to confer standing on Vogel because it does not constitute a concrete and particularized invasion of any legally protected right.[6] Vogel lacked standing in the court of appeals, and he likewise lacks it here.

### III.

The scope of a guardian's authority to make end-of-life decisions for a ward is, without question, an exceedingly important question. But it is a bedrock constitutional

---

[6] The plurality's approach, extended to its logical end, would provide standing to an attorney who is dissatisfied with a decision received by a client, even if the client chooses not to appeal the decision. If the requirement of standing is to be stretched so far that it arguably becomes nothing more than a formality, the change should come by means of a constitutional amendment, not through a decision of this court.

principle that Minnesota courts lack the authority to decide *any* legal question, even an exceedingly important one, in the absence of a justiciable controversy. When a justiciable controversy is missing, as it is here, and as it was in the court of appeals, it is our constitutional duty to dismiss the case. In the absence of a justiciable controversy, it is the Legislature's job, not ours, to clarify the scope of a guardian's authority in making end-of-life decisions for a ward. To reach any other conclusion would violate Article III, Section 1 of the Minnesota Constitution. For these reasons, I would vacate the decision of the court of appeals and remand with instructions to dismiss the appeal for lack of subject matter jurisdiction.

PAGE, Justice (dissenting).

I join in the dissent of Justice Stras.